**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **NONEND INVENTIONS N.V.,** | **Case No. 12-1041-GMS** |
|     **Plaintiff and Counterclaim-Defendant,** | **Case No. 13-00389- GMS** |
|   **v.** | **JURY TRIAL DEMANDED** |
| **SPOTIFY USA INC., et al,** | |
|     **Defendants and Counterclaim-Plaintiffs.** | |

**PLAINTIFF AND COUNTERCLAIM DEFENDANT NONEND INVENTIONS N.V.'S
OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

**Title**                                                 **Page**

I.  INTRODUCTION                                             1

**II.**  TECHNOLOGY BACKGROUND                         1

III. GENERAL PRINCIPLES GOVERNING CLAIM CONSTRUCTION    3

IV. LEVEL OF SKILL IN THE ART                            4

V.  TERMS FOR CONSTRUCTION                           5

    A.  The "Streaming" Terms                       5
    B.  The "Communication Channel" Terms        8
    C.  Production Node                           10
    D.  Central Node                             11
    E.  Consumer Node                         12
    F.  The "Network" Terms                    13
    G.  The "System" Terms                    15
    H.  Peer Node/Device                      17
    I.  Autonomously                            19

## TABLE OF AUTHORITIES

| **Cases** | **Page** |
|---|---|
| *ACTV, Inc. v. Walt Disney Co*., 346 F.3d 1082 (Fed. Cir. 2003) | 4, 9, 13, 18 |
| *Acumed LLC v. Stryker Corp.*, 483 F.3d 800 (Fed. Cir. 2007) | 15 |
| *Alloc, Inc. v. ITC*, 342 F.3d 1361 (Fed. Cir. 2003) | 6 |
| *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324 (Fed. Cir. 2006) | 4, 10, 16 |
| *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182 (Fed. Cir. 1998) | 6, 15 |
| *Cybor Corp v. FAS Techs.*, 138 F.3d 1448 (Fed. Cir. 1998) | 3 |
| *Decisioning.com, Inc. v. Federated Dept. Stores, Inc.*, 527 F.3d 1300 (Fed. Cir. 2008) | 4 |
| *Eastman Kodak v. Goodyear Tire & Rubber Co*., 114 F.3d 1547 (Fed. Cir. 1997) | 3 |
| *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364 (Fed. Cir. 2003) | 7 |
| *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327 (Fed. Cir. 2004) | 8 |
| *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985 (Fed. Cir. 1999) | 3, 13 |
| *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005) | 14, 16 |
| *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133 (Fed. Cir. 2004 | 9 |
| *Phillips v. AWH Corp*., 415 F.3d 1303 (Fed. Cir. 2005*)* | 3, 4, 12, 13, 14, 15 |
| *Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340 (Fed. Cir. 2007) | 7, 9, 14 |
| *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313 (Fed. Cir. 2002) | 7 |
| *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576 (Fed. Cir. 1996) | 3, 4, 9 |

## I.      INTRODUCTION

Plaintiff and Counterclaim Defendant Nonend Inventions N.V.'s ("Nonend") six distributed computing patents-in-suit cover a broad range of inventions relating to the distribution of streaming data in a network.  Nonend has identified a limited number of technical claim terms for which it believes a construction would aid the jury's understanding.  Nonend's constructions reflect the claim language and the specification's teachings, and capture the true scope of the patents' inventions.     Defendants and Counterclaim-Plaintiffs Spotify USA Inc., Spotify Limited, Spotify Technology S.A., and Spotify AB ("collectively Defendants"), by contrast, argue many terms require construction, including terms where the plain and ordinary meaning is well understood, and repeatedly urge that a "peer node" limitation be added to claim terms where the context of the claim language teaches otherwise.  This classic tactic of trying to import discrete concepts and limitations from the specification into the claim language improperly narrows the claims' proper scope.  Nonend respectfully submits that the intrinsic evidence will lead the Court to conclude that Nonend's proposals most accurately capture the meaning of the disputed claim terms.

## II.     TECHNOLOGY BACKGROUND

The six patents-in-suit[1] are novel improvements in the data distribution networking field. While they share the specification of the original Dutch patent application filed on February 16, 2001, each patent represents diverse claims directed to improving data distribution among network devices by decreasing latency, bandwidth requirements and overall cost.  The claimed methods and apparatus enable the efficient and fast delivery of streaming data content over a vast

---

[1] Collectively the patents-in-suit are U.S. Patent Nos. 7,587,508 (the "'508 patent") (Joint Appendix ("A") A-1–A-54), 7,590,752 (the "'752 patent") (A-55–A-109), 7,779,138 (the "'138 patent") (A-110–A-170), 8,090,862 ("'the 862 patent") (A-171–A-230), 8,099,513 (the "'513 patent") (A-231–A-292) and 8,266,315 (the "'315 patent") (A-293–A-353).

1

area with minimal cost.   At a high level, the patents involve distributed computing where independent computers or nodes in the network function cooperatively to achieve a computational goal, in this case, the distribution of data.   *See* A-46 at col 2:5-43.[2]   Distributed computing can be contrasted with centralized computing where all computational activity is concentrated in a terminal server to which clients are attached.   Employing the claimed data distribution methods avoids terminal server congestion and reduces data distribution latency due to increased available bandwidth.   The Nonend patents represent a novel and valuable contribution to the arts in this era of cloud computing and electronic media streaming.

The patents are directed to "generating and maintaining an organic network with a dynamic topology."   A-46 at col. 1:19-21.   In the organic network, nodes of the network are provided with software which enables each node to make its own functional decisions regarding the distributed of data within the network.   A node can be provided with different software modules that allow it to perform roles of, for example, a production node, consumer node, router node or portal node.   *See* A-49 at col. 8:16-22.   The claims further describe "receiver-driven" data distribution, in which data is only sent to a node if the receiving node asks for it.   The particular claims at issue are directed to the distribution of streaming data or content among the nodes of the network.   A node coupled with playback equipment such as a media player can request streaming audio or video content and playback the content while also acting as a source of the content for another node in the network.   In this manner, the invention permits nodes to propagate streaming content through the network quickly and efficiently with little centralized cost.   *See* A-46 at col. 2:4-9.

The six patents' unique claim sets center on different aspects of streaming data distribution.   For example, the '508 patent focuses on data distribution among peers in a peer-to-

_____

[2] All the specification citations are to the '508 patent (A-1–A-54) unless otherwise noted.

peer network, while the most recently issued '315 patent is directed to one consumer node receiving streaming content from a production node while processing content received from a second consumer node for playback.   The '138 and '513 patents include streaming while searching for additional media player devices in the network and the '862 patent concerns using multiple communication channels for streaming and playback.   All claims contemplate that the novel organic data distribution method can be combined with playback equipment so that the streaming content can be played back for the user's enjoyment.

## III.   GENERAL PRINCIPLES GOVERNING CLAIM CONSTRUCTION

Given Defendants' constructions, it bears repeating that the starting point for claim construction is the words of the claims themselves and they should be given their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *See Phillips v. AWH Corp*., 415 F.3d 1303, 1312-14 (Fed. Cir. 2005*); Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).   While none of the intrinsic information should be ignored, the Federal Circuit has indicated that the claim language itself defines the scope of the claim, and a construing court does not accord the specification, prosecution history and other relevant evidence the same weight as the claims themselves.  *See Eastman Kodak v. Goodyear Tire & Rubber Co*., 114 F.3d 1547, 1552 (Fed. Cir. 1997), *overruled on other grounds*, *Cybor Corp v. FAS Techs*., 138 F.3d 1448, 1456 (Fed. Cir. 1998). Thus, the Court must presume that the terms in the claim mean what they say, and unless otherwise compelled, give full effect to the ordinary meaning of claim terms.  *See Johnson Worldwide Assocs., Inc. v. Zebco Corp*., 175 F.3d 985, 989 (Fed. Cir. 1999).   In fact, the Federal Circuit has gone as far as saying that there is a "heavy presumption in favor of the ordinary meaning." *Id*.   "It is both unjust to the public and an evasion of the law to construe an invention in a manner different from the plain import of its terms." *Phillips*, 415 F.3d at 1312 (internal

3

quotations omitted).   The context of the surrounding words of the claim term is also instructive in determining its meaning.  *See id*; *ACTV, Inc. v. Walt Disney Co*., 346 F.3d 1082, 1088 (Fed. Cir. 2003).   Moreover, different claim terms are presumed to have different meanings.  *See Applied Med. Res. Corp. v. U.S. Surgical Corp*., 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006). Although "claims must be read in view of the specification, of which they are a part," great care must be taken not to import a limitation from the specification into the claims.  *Phillips*, 415 F.3d at 1315, 1320. When the specification reveals a definition given to a claim term by the patentee, the inventor's lexicography governs, but the special definition of the term must be *clearly* stated in the specification or the file history.  *See id*. at 1316; *Vitronics*, 90 F.3d at 1582.   Thus, the Court must "determine whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive."  *Decisioning.com, Inc. v. Federated Dept. Stores, Inc*., 527 F.3d 1300, 1307-08 (Fed. Cir. 2008).   Finally, while the Court may consider the prosecution history, it "often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Phillips*, 415 F.3d at 1317.

## IV.     LEVEL OF SKILL IN THE ART

Nonend proposes that the level of ordinary skill in the art is a person with a Bachelor's degree in Computer Science and one or two years of experience in the Computer Science industry or the equivalent experience and education obtained working in the Computer Science industry.

## V.  **TERMS FOR CONSTRUCTION**

### A. **The "Streaming" Terms**

| Terms/Phrase | Nonend's Proposed Construction | Spotify's Proposed Construction |
|---|---|---|
| Streaming (n.)[3] | Transmission of content that may be played by the receiver while the transmission is occurring | The continuous transmission of data packages that are received by a receiver in sequential order and played by the receiver while the transmission is occurring |
| Streaming (adj.)[4] | Transmitted and may be played by the receiver while the transmission is occurring | Transmitted continuously and received in sequential order by a receiver and played by the receiver while the transmission is occurring |
| Streamed[5] | Transmitted and may be played by the receiver while the transmission is occurring | Transmitted continuously and received in sequential order by a receiver and played by the receiver while the transmission is occurring |

Streaming content between nodes is central to the claims of the patents-in-suit.  Nonend's construction reflects the unique nature of streaming: the transmission of content to a node whereby the node can play the content while it is receiving the content.  In other words, the node can begin to play the content before receiving it all in contrast to, for example, downloading, where all the content must be received before it can be played.  The specification does not define streaming but the parties agree on at least this portion of its construction.

Defendant's construction, however, goes further and injects descriptive language from the specification to unduly limit the claims' scope. First, Defendants argue that the transmission must be *continuous*.  Second, Defendants urge that the transmission must be *sequential*.  Third, Defendants maintain that the content *must be played* in order for streaming to occur.  The first two arguments import limitations from the specification. The last argument is nonsensical.

---

[3] This term appears in the '508 patent claims 1, 23 (A-52–A-54) and the '752 patent, claim 1(A-107).

[4] This term appears in the '138 patent, claim 22 (A-169–A-170); the '862 patent, claims 1 12 (A-230); the '513 patent, claim 33 (A-291); and the '315 patent, claim 1(A-352).

[5] This term appears in the '508 patent, claims 1, 23 (A-52–A-54); the '138 patent, claim 22(A-169–A-170); the '862 patent, claims 1, 12(A-230); and the '315 patent, claims 1, 31(A-352).

To be sure, the inventors recognized the fixed time line aspect of media content and patented a content distribution system which recognized the benefit of uninterrupted transmissions. Indeed, the specification describes the advantage of continuous and sequential streaming of audio and video content because en route delays in transmission results in an irregular broadcast. *See e.g.,* A-46 at col. 2:36-43; A-49 at col. 7:1-10. That said, the inventors did *not* limit their invention only to continuous and sequential content transmission. Importantly, the claim language, which defines the scope of the invention, specifies *nothing* about continuous and sequential transmission. "[T]here is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification," *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998), and the Court should "look to whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment." *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1370 (Fed. Cir. 2003). Contrary to Defendant's construction, the specification actually contemplates the streaming of content out of order and with interrupted transmission.

The specification describes switching from one source of content to another and thus inherently contemplates a break in the transmission upon that change. *See* A-48 at col. 5:30-35. The specification also explicitly describes receipt of content from two sources (A-49 at col 7:40-45) as well as differing transmission rates among sources (A-49–A-50 at col 8:60-col 9:9) leading to the conclusion that given two source streaming at different speeds, it is within the scope of the claims to have non-sequential receipt of content given one source transmitting faster than another. *See generally*, A-51 at col. 11:38-12:26 (describing in detail the switching of sources and receipt of content from multiple sources.) The *preference* for continuous and

6

sequential streaming attributes is expressed but neither the claim language nor the specification *requires* Defendants' construction.   "An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them." *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003) (holding statements in the "Advantages of the Invention" section will not limit the claim scope absent clear lexicographic intent).   The specification notes the benefit of continuous and sequential streaming but does not define streaming by those characteristics.   By including the requirements of continuous and sequential transmission, Defendants import descriptive, albeit advantageous, limitations that unjustifiably narrow the invention's proper scope.   *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002) ("Unjustifiably importing limitations from the specification is the 'cardinal sin of claim construction.'").

Defendant's third requirement that the content *must be played* for streaming to exist is nonsensical.   Take, for example, a node that is receiving streaming content and playing the content at the same time, however, the user pauses playback and the content stops playing while it is still being received by the node.   Under Defendants' construction the content is suddenly no longer streaming simply because the user paused playback even though the nature of the transmission has not changed. Nonend's construction accounts for this situation in that the content may be played back but does not necessarily have to be played back, and still distinguishes streaming (where content can be played while it is being received) from other situations such as downloading (where content cannot be played until fully received). Defendants' stringent requirement that the content must be played back should be rejected.[6]

_____

[6] Defendants also substitute in their construction "data packages" for "content."  While the specification mentions the transmission of data packages (A-46 at col. 2:40-44), the claims use the term "content" which is broader and more accurately reflects the scope of the claims. *See e.g.,* A-52 at col. 14:66-67.

7

### B.  The "Communication Channel" Terms[7]

| Terms/Phrase | Nonend's Proposed Construction | Spotify's Proposed Construction |
|---|---|---|
| First Communication channel | A first connection via a transmission medium | A first connection via a transmission medium to a first peer node |
| Second Communication channel | A second connection via a transmission medium | A second connection via a transmission medium to a second peer node |

The parties' primary dispute on the communication channel constructions is whether the claim terms require a connection (from the media player) to a first/second peer node.  Nonend concisely construes the communication channel as a transmission medium.    Defendants improperly add what the channel must connect to —"a first peer node" and "a second peer node." Defendants go too far by reading in limitations not present in the claim language. *See Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331-32 (Fed. Cir. 2004) (rejecting attempts to improperly introduce limitations from the specification into the claim language).

The pertinent language of Claim 1 of the '862 patent is instructive:

> 1. A method for receiving data packages of a streaming item of content at a receiving media player, using at least two communication channels, the method comprising:
> receiving one or more data packages corresponding to at least a part of the item of content over *a first communication channel operationally coupled to the receiving media player*;
> initiating a request for at least a part of the item of content over *a second communication channel operationally coupled to the receiving media player*;
> receiving, in response to initiating the request, one or more data packages corresponding to at least a part of the item of content, over the second communication channel; and
> making incoming content received over the first communication channel ready for processing and play-back at the receiving media player, such that part of the item of content is streamed to a stream target at the receiving media player, while another part of the item of content is being *received by the receiving media player over the second communication channel*.

A-230 at col. 15:2-21.   The claim language unambiguously states that the first and second communication channels are *operationally coupled to* the claimed receiving media player and the

---

[7] These terms appear in the '862 patent, claims 1, 12 (A-230).

media player receives content over the two communications channels.   Thus, the claim requires two communication channels which must be coupled to the media player so that it can receive content.   The claim goes no further and is completely silent as to what the receiving media player is connected to via the communication channels.  *See ACTV, Inc.*, 346 F.3d at 1088-1091 (construing the term URL in the context of the surrounding claim language).   The patentees intentionally sought broad coverage for their invention by not specifically claiming the source or sources of the content received by the media player.

Defendants' two peer node requirement is inconsistent with the claim language and refuted by the specification.   Not only is the source of the content transmitted over the communication channels not specifically limited to a peer node, it also is not limited to two sources.  For example, Figures 5A-E demonstrate a situation where content can be received over two different transmission channels (in that embodiment, the media are a cable and electrical grid) from the same source (transmitter 50).  *See* A-24–A-26, A-50–A-51 at col. 10:66-col. 11: 30.   At best, the source is identified in the specification as a singular "transmitter" and not, as Defendants propose, a peer node.  *See* A-51 at col. 11:15-17.   Further, the patent also teaches that the content can come from consumer nodes or production nodes which may or may not be peer nodes depending on their functionality.  *See* A-49 at col. 7:40-45.   While it is certainly possible for a receiving media player to request and receive content from two sources, Defendants construction *requires sourcing from two peer nodes,* which excludes a preferred embodiment.   It is axiomatic that "a claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct."  *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004); *Vitronics*, 90 F.3d at 1583.

9

### C.  <u>Production Node</u>

| Terms/Phrase | Nonend's Proposed Construction | Spotify's Proposed Construction |
|---|---|---|
| Production Node[8] | A node that initially provides the content to the network and can transmit content to another node when requested | A peer node that transmits content to other nodes when they request such |

Nonend's construction reflects *all* the intrinsic evidence.  The claim language teaches that a media player (the '513 patent) or a consumer node (the '315 patent) can issue requests to a production node and in turn receive content from the production node.  The specification teaches that a production node is a node that transmits "content to other nodes when they request such." A-47 at col. 4:62-64. While Defendants' construction stops here (except with the unwarranted injection of "peer"), the specification continues to teach that a production node is more than just a node that delivers content when requested:

> Better yet, if so desired the consumer node is able to ***adapt the content, add content itself*** (for instance subtitling in a certain language in a streaming video content) ***or generate its own content***, such as local advertising messages, or local news. As a result a consumer node simultaneously ***is a production node***."

A-48 at col. 5: 40-45.  Accordingly, the specification instructs that in order to be a production node, the node must do more than just provide content to other nodes when requested; otherwise it is just a consumer node passing on unoriginal content it received from another node.  A production node adapts, adds or generates content unlike a consumer node which merely delivers content it has received.  Nonend's construction comports with all the intrinsic evidence and captures the specified concepts that the production node generates the content and initially provides it to a network of nodes for distribution.  Moreover, Defendants' construction also ensnares the definition of "consumer node" (*see infra* Section E) and thus improperly conflates meaning of the two distinct claim terms.  *See Applied Med. Res. Corp.*, 448 F.3d at 1333 n.3

---

[8] This term appears in the '513 patent, claim 33 (A-291); and the '315 patent, claims 1, 8(A-352).

("[T]he use of two terms in a claim requires that they connote different meanings…."). The patentees used different terms to describe the various aspects of their invention and Defendants' construction renders those distinctions meaningless.

Finally, consistent with their narrowing theme, Defendants again inject "peer" into their construction. This is unsupported by the specification. First, the claim language does not mention peer at all.[9] Second, the specification does not refer to a production node as a peer node. Rather, it makes a distinct between different types of nodes which may change roles depending on their functionality. *See* A-49 at col. 8:16-22. To limit a production node to a peer node as Defendants suggest would be contrary to the intrinsic evidence.

### D.  Central Node

| Terms/Phrase | Nonend's Proposed Construction | Spotify's Proposed Construction |
|---|---|---|
| Central node[10] | A node that controls data transmission among other nodes in a hierarchic system | A node that controls other nodes in a hierarchic system |

The parties agree that a central node is a node that controls other nodes in a hierarchic system but disagree as to the extent of that control. Defendants intimate full control by the central node. Rather than assuming full control, Nonend's construction looks to the intrinsic evidence. Because the invention of the patents-in-suit teaches away from central node control and the language claims an absence of a central node, the specification only briefly refers to a central node in the background of the invention: "Additionally a network ("multicast network") of nodes is known from U.S. Pat. No. 5,511,16[8] which nodes, however, are each part of a hierarchic system. Each node is centrally controlled *here* by means of a central node." A-46 at col. 1:36-39 (emphasis added). Thus, to understand the depth of control, one must look to U.S.

---

[9] Only the '508 patent claims a peer-to-peer network employing transmitter peers and receiver peers. The '508 patent claims do not mention production or consumer nodes. See (A-52–A-53).

[10] This term appears in the '513 patent, claim 38 (A-291).

Pat. No. 5,511,168[11] ("the '168 patent") (A-354–A-363) incorporated into the specification. The '168 patent relates to a multicast virtual circuit arrangement where a source node (or central node) creates virtual circuits among a group of destination nodes. The virtual circuits allow data transmission among nodes in multicast environment and the source node can maintain control over of the virtual circuit configurations. *See* A-360, '168 patent at col. 3:11-24; 5:49-59. Nonend's construction captures the source node control of virtual circuit pathways described in the '168 patent and incorporated by the patents-in-suit to propose a proper construction for central node. Defendants' construction is simply too broad and would create confusion over what control the central node may exert.

### E.  Consumer Node

| Terms/Phrase | Nonend's Proposed Construction | Spotify's Proposed Construction |
|---|---|---|
| Consumer Node[12] | A node that is provided with software to receive content and to deliver it to other nodes requesting such, independent of the source | A peer node that is provided with software to receive content and to deliver it to other nodes requesting such, independent of the source |

The parties agree on the construction of "consumer node" with one exception; Defendants again add the "peer" concept into their construction. Nonends' construction is taken directly from the specification and comports with the claim language. *See* A-48 at col. 5:3-5. The claim language does not mention "peer" nor does the specification require that a consumer node be a peer node. A consumer node could be a peer node, but it does not necessarily need to be. Including "peer" in the construction of consumer node is contrary to the specification and would result in yet another importation of a limitation to unduly narrow claim scope. *See Phillips*, 415 F.3d at 1320. Defendants' construction is has no support in the relevant intrinsic evidence.

---

[11] Several of the patents-in-suit contain a printing error which incorrectly refers to the U.S. Pat. No. 5,511,16<u>7</u> rather than U.S. Pat. No. 5,511,16<u>8</u>.
[12] This term appears in the '315 patent, claims 1, 8, 31, 37 (A-352–A353).

### F.  The "Network" Terms

| Terms/Phrase | Nonend's Proposed Construction | Spotify's Proposed Construction |
|---|---|---|
| Network[13] | No definition required – plain and ordinary meaning | A group of interconnected peer nodes |
| Peer-to-peer network[14] | No definition required – plain and ordinary meaning | A network of peer nodes |
| Network of media players[15] | No definition required – plain and ordinary meaning | A group of interconnected peer nodes for connecting media players |

The "Network" terms need no construction as their ordinary meaning is sufficient.  The word "network," when read in light of the claim language as a whole, is a plain and unambiguous claim term that gains little by way of clarity through a construction.  Defendants improperly narrow this meaning by (again) injecting "peer node" into their constructions.

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  *Phillips*, 415 F.3d at 1314.  Such is the case here.  Not only does Defendants' construction run counter to the "heavy presumption in favor of the ordinary meaning," *Johnson Worldwide Assocs., Inc.*, 175 F.3d at 989, it ignores how the claims and specification use the term.

The patents use "network" in a broad sense to describe an interconnected group of things.  In each instance, surrounding claim language modifies the term to define what type of network it is.  *See ACTV*, 346 F.3d at 1088-1091.  For example, claim 33 of the '513 patent refers to a "network *of media players*," claim 1 of the '508 patent addresses a "*peer-to-peer* network," and claims 1 and 31 of the '315 patent describe a "network *enabling communications between a*

---

[13] This term appears in the '315 patent, claims 1, 31 (A-352–A353).

[14] This term appears in the '508 patent, claim 1 (A-52–A-53).

[15] This term appears in the '513 patent, claim 33 (A-291).

***first consumer node, a second consumer node and a third consumer node***" – *i.e.*, a network of consumer nodes. The specification uses "network" in the same manner, referring to "***organic data*** networks," "***data*** networks," "***multicast*** networks," "***classic*** networks," "***peer-to-peer*** networks," and "***physically cabled*** networks." *See e.g.,* A-46–A-47 at col. 1:36; 2:4; 2:10; 2:11; 2:19-20; 2:55.   Contrary to Defendants' limiting constructions, the intrinsic evidence demonstrates that a skilled artisan would understand the ordinary meaning of "network" as used in the patents.

Moreover, Defendants' constructions render certain claim language superfluous. Defendants' insistence that "network" means "a group of interconnected peer nodes" makes the words "peer-to-peer" meaningless when construing "peer-to-peer network" in claim 1 of the '508 patent. *See e.g., Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) (a preferred claim construction is one that gives meaning to all of the claim's terms). Defendants employ a sleight of hand to mask this obvious deficiency in their construction of "peer-to-peer network" by leaving the word "network" unchanged in that construction, but Defendants have no basis to argue that network is used in a different context in the '508 patent as compared to the '315 and '513 patents. *See, e.g., z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1348 (Fed. Cir. 2007) (the same claim terms in the same or related patents are presumed to carry the same construed meaning).

Finally, Defendants' construction of the word "network" as part of "network of media players" violates the claim differentiation doctrine. *See e.g., Phillips*, 415 F.3d at1315; *Comark Commc'ns Inc.,* 156 F.3d at 1187 (the claim differentiation doctrine creates the presumption that each claim in a patent has a different scope).  Defendants construe "network of media players" in claim 33 to mean "A group of interconnected peer nodes for connecting media players."

14

Dependent claim 40, however, states that the media players in the "network of media players" referred to in claim 33 are "peer systems."   This implies that the term "network of media players" in independent claim 33 is broader and encompasses a network where not all media players are peers. *See, e.g., Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").   Indeed, the limitation of the media players being peers set forth in claim 40 is the only meaningful difference between claims 33 and 40, which only strengthens the claim differentiation presumption. *See, e.g., Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) (the claim differentiation doctrine presumption is "especially strong" when the limitation that one party is arguing should be read into the independent claim is the only meaningful difference between the independent and dependent claims).

### G.  The "System" Terms

| Terms/Phrase | Nonend's Proposed Construction | Spotify's Proposed Construction |
|---|---|---|
| Peer system[16] | No definition required - plain and ordinary meaning | A peer-to-peer network |
| System for distributing media content[17] | No definition required - plain and ordinary meaning | A network of peer nodes used to transmit audio and video content |

The "system" terms when read in light of the claim language as a whole, are plain and unambiguous.   Defendants' constructions simply substitute the word "network" for "system."   This choice infects the "system" terms with the same deficiencies as the "network" terms outlined above.   These constructions are also inconsistent with the intrinsic evidence.

For example, the '513 patent claim language clearly sets out the meaning of "system."

    1.  ***A media player system*** configured to request and receive streaming content from one or more production nodes or ***other media player systems***, ***the media player system*** comprising:

---

[16] This term appears in the '513 patent, claim 40 (A-291).
[17] This term appears in the '752 patent, claim 1 (A-107).

\*\*\*

9. **The media player system** of claim 1, wherein the search routine is executed by directly contacting **other media player systems** running the software.

\*\*\*

40. The method of claim 33, wherein the media player and the other media players in the network are **peer systems**.

A-290–A-291 at col. 15:4-7, 15:49-51, 18:28-29 (emphasis added).    This claim language supports a broad definition for "system" that is further modified to disclose the specific type of system – *i.e.*, a **peer** system or a **media player** system.   The specification is consistent, likewise modifying "system" to variously identify a "**media player** system," a "**hierarchical** system," a "**multi-agent** system," a "system **of agents**," a "**traffic information** system," a "**route navigation** system for a car," "systems **that provide vehicles with information**," and a "**car-information** system." A-231, A-283, A-284, A-287 at Abstract, col. 1:43-57, 4:37-41, 10:66-67.    This intrinsic evidence contradicts Defendants' limiting constructions and demonstrates that a skilled artisan would understand the ordinary meaning for "system" as used in the patents.

Defendants' construction suffers from numerous other problems. First, it ignores the plain language of claim 40, which uses both "network" and "systems."   The presence of both terms in the same claim is further proof that the terms are not interchangeable as Defendants argue.   *See Applied Med. Res. Corp.*, 448 F.3d at 1333 n.3.   Second, it is implausible; dependent claim 40 would be construed as "[t]he method of claim 33, wherein the media player and the other media players in the network are [peer-to-peer networks]." Third, it renders the "peer" language in claim 40 a nullity. If "system" just means "network" and "network" is limited to groups of "peer nodes," then "peer" has no meaning in the context of the claim term "peer systems."[18] *See Merck & Co.*, 395 F.3d at 1372.   Finally, Defendants' construction of "peer

---

[18] Defendants attempt to camouflage this problem by using the word "network" in its construction for "peer system" rather than the "group of interconnected peer nodes" language

systems" violates the claim differentiation doctrine for the same reasons as addressed above with regard to the "network of media players" term.

### H. **Peer Node/Device**

| Terms/Phrase | Nonend's Proposed Construction | Spotify's Proposed Construction |
|---|---|---|
| Peer Node[19] | No definition required - plain and ordinary meaning | A node in a network that can act as a transmitter (server) of data packages at one moment or as a receiver (client) of data packages at another moment and changes its role on its own initiative |
| Device[20] | No definition required - plain and ordinary meaning | A peer node |

Neither "peer node" nor "device" require construction. Defendants' constructions that equate "device" with "peer node" once again ignore the claims' plain language. The intrinsic evidence demonstrates that these terms are not synonymous and that no construction is required for these terms as one of skill would understand the terms within the context of the claims.

The '752 patent's claims 1 and 4 state that a first media player initiates a process to "retrieve at least a part of the item of media content from at least one *device* selected from the group consisting of the first media player and one or more further *devices*." A-107 at col. 15:26-29, col. 16:15-18 (emphasis added). The '138 patent's claim 22 uses the term in a similar fashion, identifying a "device" or "devices" that store or run media player software and share streaming content from the media player software. *See* A-169 at col. 16:58-17:13. The specification teaches that "devices" may comprise communication equipment, a media player (which can include a television, radio, personal computer or other playback equipment) or mobile communication equipment (which can include mobile phones, satellite telephones, pocket

---

is unavailing. *See, z4 Techs., Inc.*, 507 F.3d at 1348 (The same claim terms in the same or related patents are presumed to have the same construed meaning).

[19] This term appears in the '508 patent, claims 1, 3, 4, 6, 7, 11, 13, 23 (A-52–A-54).

[20] This term appears in the '752 patent, claim 1 (A-107) and the '138 patent, claim 22 (A-169–A-170).

computers, PDAs, game computers and other mobile equipment).  *See* A-47 at col. 4:14-29.  The intrinsic evidence thus supports a broad reading of "device" as any type of equipment that can meet the limitations of each claim—a meaning one of skill would surely understand.

Defendants' construction of "peer node" suffers from other maladies.  Defendants do not propose any special construction of the word "node," instead focus on how "peer" modifies "node."  Defendants again import specific embodiments from the specification to improperly limit the broad meaning of "peer."  These importations, however, essentially track the attributes ascribed to a "peer node" by the claim language itself.  *See ACTV, Inc.*, 346 F.3d at 1088-1091.  For example, throughout claim 1 of the '508 patent, the term "peer node" is modified in every instance by either "receiver" or "transmitter."  *See* A-53–A-53 at col. 14:66-15:26.  The claim language further instructs that a "receiver peer node" receives content or data packages transmitted by the "transmitter peer nodes."  *Id.*  As such, the claim language as a whole provides the meaning of "peer node."

Defendants' construction fails to take the claim language as a whole into account.  The specification itself notes that the ordinary meaning of the term "peer node" was understood at least as of the time of the filing of the Dutch application.  *See* A-46 at col. 2:19-21 ("applications of so-called peer-to-peer networks …are known.").  That ordinary meaning, when used within the claim language, provides a proper understanding of what is claimed.  There is simply no basis to adopt Defendants' constructions for "peer node" and "device."

### I.  <u>Autonomously</u>

| Terms/Phrase | Nonend's Proposed Construction | Spotify's Proposed Construction |
|---|---|---|
| Autonomously[21] | No definition required - plain and ordinary meaning | On its own initiative and independent of other nodes |

The term "autonomously" when read in light of the claim language as a whole, is plain and unambiguous.  Defendants' construction for this straightforward lay term is contrary to the intrinsic evidence and confusing. The claims use "autonomously" to describe how media player software decides to *search* for other devices or media players running the media player software (the '513 and '138 patents), or how a consumer node *determines* when to receive data packages from other consumer nodes (the '315 patent).  *See*, *e.g*., A-291 at col. 17:46-18:8, 18:34-52; A-169–A-170 at col. 16:58-17:14; A-352 at col. 15:50-55.  Claim 7 of the '315 patent states that the "first consumer node ***autonomously determines*** when to receive data packages of the content . . . based on evaluation of the first connection and the second connection."  A-352 at col. 15:50-55. Similarly, claim 20 of the '138 patent states that media player "***autonomously search[es]*** for other media players by directly contacting the other media players." A-169 at col. 16:50-54.  No further construction is necessary to understand the plain and ordinary use of "autonomously" given the context of the claim language as a whole.

Defendants' construction is problematic because insertion of the "independent of other nodes" suggests the searching and determining occur absent other nodes.  This extra limiting phrase contradicts the claim language and the specification.  First, the claim language never suggests that "autonomously" searching or "autonomously" determining must be "independent of other nodes."  Indeed, the '138 patent specifically contemplates that the media player directly contact other media players in the searching.  *See* '138 patent, col. 16: 50-54.  Accordingly,

---

[21] This term appears in the '513 patent, claim 33 (A-291), the '138 patent, claim 22 (A-169), and the '315 patent, claim 37 (A-353).

Defendants' construction is directly at odds with the claim language.

The specification further contradicts Defendants' construction.

"Said second consumer node may get its content from either the production node, or from the first consumer node, whichever data connection it judges as being the better one. Special however is that the consumer node is able to act entirely *autonomous* **and** *independent of the production node*."

*See* A-48 at col. 5:41-46 (emphasis added).  The use of "and" plainly suggests are two benefits of

the consumer node – its ability to act (i) autonomously and (ii) independent of the production

node.  Defendants cannot import this second separate benefit into "autonomously."


Dated:  October 18, 2013                    STAMOULIS & WEINBLATT LLC

                                            */s/ Stamatios Stamoulis*
                                            Stamatios Stamoulis #4606
                                                 stamoulis@swdelaw.com
                                            Richard C. Weinblatt #5080
                                                 weinblatt@swdelaw.com
                                            Two Fox Point Centre
                                            6 Denny Road, Suite 307
                                            Wilmington, DE 19809
                                            Telephone:  (302) 999-1540

                                            OF COUNSEL:
                                            Richard C. Vasquez
                                            Jeffrey T. Lindgren
                                            Eric W. Benisek
                                            Robert S. McArthur
                                            Stephen C. Steinberg
                                            VASQUEZ BENISEK & LINDGREN LLP
                                            3685 Mt. Diablo Blvd., Suite 300
                                            Lafayette, CA 94549
                                            Telephone: (925) 627-4250
                                            Facsimile: (925) 403-0900
                                            rvasquez@vbllaw.com
                                            jlindgren@vbllaw.com
                                            ebenisek@vbllaw.com
                                            mcarthur@vbllaw.com
                                            ssteinberg@vbllaw.com

                                            *Attorneys for Nonend Inventions, N.V.*

20