IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NONEND INVENTIONS N.V., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-1041-GMS |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| SPOTIFY USA INC., *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS SPOTIFY USA INC., SPOTIFY LIMITED,
SPOTIFY TECHNOLOGY S.A., AND SPOTIFY AB'S
OPENING *MARKMAN* BRIEF**

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza

OF COUNSEL:

P.O. Box 951
Wilmington, DE  19899
(302) 984-6000

Henry C. Bunsow
Craig Y. Allison
Alden K. Lee
Aaron R. Hand
BUNSOW, DE MORY, SMITH & ALLISON LLP
55 Francisco Street, Suite 600
San Francisco, CA  94133
(415) 426-4747

provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Defendants
Spotify USA Inc., Spotify Limited, Spotify
Technology S.A. and Spotify AB*

Dated:  October 18, 2013

## TABLE OF CONTENTS

PAGE NO.

I.      INTRODUCTION ......................................................................................1

II.     BACKGROUND .......................................................................................1

        A.      Peer-to-Peer Networks In General.................................................2

        B.      The Asserted Patents Concern Peer-to-Peer Technology....................3

III.    LEGAL STANDARDS ..............................................................................8

IV.     ARGUMENT ..........................................................................................10

        A.      Disputed Constructions..............................................................10

                1.      "Streaming (n.)"; "Streaming (adj.)"; and "Streamed" .............10

                2.      "Peer node" .................................................................13

                3.      "Device" .....................................................................14

                4.      "Production node" .........................................................15

                5.      "Central node" ..............................................................16

                6.      "Consumer node" ..........................................................17

                7.      "Peer-to-peer network"; "Peer system"; "Network"; "A system for
                        distributing media content"; and "Network of media players" .............17

                8.      "Autonomously".............................................................19

                9.      "First communication channel" and "Second communication channel"...19

V.      CONCLUSION ........................................................................................20

# TABLE OF AUTHORITIES

PAGE NO.

**Cases**

*Astrazeneca AB v. Mut. Pharm. Co.,*
  384 F.3d 1333 (Fed. Cir. 2004) ...........................................................................6, 9

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.,*
  132 F.3d 701 (Fed. Cir. 1998). ...............................................................................9

*C.R. Bard, Inc. v. U.S. Surgical Corp.,*
  388 F.3d 858 (Fed. Cir. 2004) ................................................................................5

*Computer Docking Station Corp. v. Dell, Inc.,*
  519 F.3d 1366 (Fed. Cir. 2008) .............................................................................9

*Graham v. John Deere Co.,*
  383 U.S. 1 (1966) ...................................................................................................8

*Honeywell Int'l, Inc. v. ITT Indus.,*
  452 F.3d 1312 (Fed. Cir. 2006) .............................................................................6

*Housey Pharms, Inc. v. Astrazeneca UK Ltd.,*
  366 F.3d 1348 (Fed. Cir. 2004) .............................................................................9

*Kara Tech., Inc., v. Stamps.com Inc.,*
  582 F.3d 1341 (Fed. Cir. 2009) .............................................................................8

*Lemelson v. Gen. Mills, Inc.,*
  968 F.2d 1202 (Fed. Cir. 1992) .............................................................................8

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
  357 F.3d 1340 (Fed. Cir. 2004) ..........................................................................6, 9

*Multiform Desiccants, Inc. v. Medzam, Ltd.,*
  133 F.3d 1473 (Fed Cir. 1998) .............................................................................8

*NTP, Inc. v. Research in Motion, Ltd.,*
  418 F.3d 1282 (Fed. Cir. 2005) .............................................................................9

*Omega Eng'g, Inc. v. Raytek Corp.,*
  334 F.3d 1314 (Fed. Cir. 2003) .............................................................................9

*Ormco Corp. v. Align Technology, Inc.,*
  498 F.3d 1307 (Fed. Cir. 2007) .............................................................................9

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......................................................................8, 9

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ....................................................................................9, 19

*Spectrum Int'l, Inc. v. Sterilite Corp.*,
    164 F.3d 1372 (Fed. Cir. 1998) ...........................................................................................9

*TDM Am., LLC v. U.S.*,
    85 Fed. Cl. 774 (Fed. Cl. 2009) ..........................................................................................9

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ...........................................................................................8

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) .....................................................................................9, 14

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) ...........................................................................................5

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .............................................................................................8

## I.   INTRODUCTION

Spotify's proposed constructions are well-supported by the specification and intrinsic record and help clarify the scope of the claims.  Indeed, Spotify's proposed constructions are grounded in the language actually used by the patentees in the specifications of the Asserted Patents, and the subject matter of the alleged inventions.  By contrast, the proposed constructions of plaintiff Nonend Inventions, N.V. ("Nonend" or "Plaintiff") are overbroad and ignore explicit limitations on the alleged invention(s) in an effort to manufacture infringement arguments.  Specifically, many of Nonend's constructions ignore the fact that the specifications of the Asserted Patents limit the invention to a *peer-to-peer network*, and explicitly *disclaim* hierarchical networks that are not peer-to-peer.  Many of Nonend's proposed constructions therefore improperly cover what the Asserted Patents have explicitly disclaimed.  Accordingly, Nonend's arguments and proposed constructions should be rejected.  Spotify's proposed constructions should be adopted.

## II.   BACKGROUND

Nonend alleges that Spotify's digital music service infringes 49 claims across six patents (collectively, the "Asserted Patents").[1]  The Asserted Patents, which are attached as Exhibits 1 through 6 to the parties' Joint Appendix, share the same specification[2] and claim priority to

---

[1] Nonend alleges infringement of claims 1-4, 6-8, 11, 13-15, 18, 19 and 23 of U.S. Patent No. 7,587,508 (the "'508 Patent"); claim 1 of U.S. Patent No. 7,590,752 (the "'752 Patent"); claims 22, 24, 25, 27-31, 37 and 38 of U.S. Patent No. 7,779,138 (the "'138 Patent"); claims 1, 2, 5, 9, 10, 12, 14, 15 and 17 of U.S. Patent No. 8,090,862 (the "'862 Patent"); claims 33, 35, 36, 38 and 40 of U.S. Patent No. 8,099,513 (the "'513 Patent"); and claims 1, 2, 3, 6, 8, 31-33, 36 and 37 of U.S. Patent No. 8,266,315 (the "'315 Patent").  The '508, '752, '138, '862, and '513 Patents were asserted against Spotify in Case No. 1:12-cv-1041-GMS on August 15, 2012.  *See* Doc. 1.  The '315 Patent was asserted against Spotify in Case No. 1:13-cv-389-GMS on March 8, 2013.  Although the cases have not been officially consolidated by the Court and remain separate matters (at least administratively), the parties have handled the '315 Patent as if it was part of the first filed case.  All references to the docket in this brief refer to the docket for Case No. 1:12-cv-1041-GMS.

[2] *See* Ex. B to the parties' Joint Claim Construction Chart (Doc. 36-2), n.1 ("Because the specifications of the patents-in-suit [are] essentially identical in substance, citations are to the '508 patent specification… for ease of reference").  For ease of reference in this *Markman* brief, all references and citations to "the specification" or "the written description" will refer to the '508 Patent's specification, unless otherwise specified.

Dutch application No. 1017388 filed on February 16, 2001.  Notably, the Dutch application does not contain what is designated in the U.S. Patents as Figures 7 to 15, nor does it describe them.[3]

### A.    Peer-to-Peer Networks In General

The Asserted Patents involve specific implementations of what is known as a "peer-to-peer network," often abbreviated "P2P."  Computer networks, such as the familiar Internet or local area networks (LANs) found in many homes and offices, allow the transmission of data between computers.  Networked computers can talk to one another by means of electronic communications over the Internet or over a local network.  Such computer networks can be categorized into several broad types.  The two types that are relevant to the Asserted Patents are peer-to-peer networks and hierarchical networks, which may be distinguished by the way in which communications between computers occurs.

A hierarchical network can be analogized to a military unit.  There is usually one person, the commanding officer, who interacts with all the subordinate soldiers beneath him.  The officer communicates his wishes to his subordinates, who in turn relay those wishes to other soldiers, who carry them out.  The subordinates may deliver reports to the officer, or request resources from the officer to carry out a new mission, or may work together at the direction of the officer. But the commanding officer is at the center of the military unit and is the one that imposes some kind of order on the communications between the subordinates.

Similarly, in a hierarchical computer network, there is one computer (or sometimes a designated set of computers), often called a "server" or a central computer, that may introduce other computers (the "client" computers) to one another, and initiate and control connections between networked client computers.  In such a centralized system, client computers typically request resources or data from a centralized server or servers.  The computers in this type of

---

[3] Certified copy of NL App. No. 1017388, submitted with application for priority parent U.S. Patent No. 7,065,548 [A-3064-3126].  "A" refers to the page numbers of the Joint Appendix of Intrinsic and Extrinsic Evidence to be filed concurrently with the parties Answering *Markman* Briefs on November 15, 2013, pursuant to the Court's Scheduling Order.

network are hierarchically arranged because they are separated into two dissimilar groups —
servers and clients, each of which has its own specific and different function.

Networks need not be arranged hierarchically, however. A peer-to-peer network is a
non-hierarchic network that is more akin to a cocktail party. The guests at a cocktail party
communicate autonomously, without any control from the host or the other guests. Any guest
can walk over to any other guest and strike up a conversation. There is no one at the party telling
the lawyer that she must talk to the schoolteacher, or the schoolteacher that he must talk to the
doctor. Communications take place at the will of each individual guest. In that sense, all guests
are equal, because each guest controls his own communications with other guests, and there is no
one to impose an order on the conversations.

In the same way, the peer computers (or "nodes") in a peer-to-peer network are all
equals, and no computer is assigned to control the rest. Any computer can initiate a
communication with other computers in a P2P network. Each computer is sometimes the
initiator, and sometimes the receiver, of a communication. In other words, because all computers
are equal, they switch roles from transmitting to receiving depending on need. They do not have
fixed roles like server and client computers in a hierarchal network.

**B.      The Asserted Patents Concern Peer-to-Peer Technology**

The Asserted Patents solely relate to P2P communications, with each of the Asserted
Patents purportedly claiming different aspects of a P2P system. The primary embodiment[4]
described in the specification of the Asserted Patents is a P2P network that can be used to
provide streaming music or other content from one peer node to another in a specific way.[5] The
specification describes how peer nodes autonomously create an "organic" peer network by
seeking out other peers that can stream music to each other.[6] The applicants acknowledge that

---

[4] The specification also briefly discusses peer networks in the context of cell phone
communications, traffic information systems, and cable networks for television. *See* '508 Patent
at 9:57-11:37 [A-50-51]. The remainder of the specification discusses the music streaming
embodiment.

[5] *See, e.g.,* '508 Patent at 2:31-43 [A-46].

[6] *See id.* at 8:16-9:56 [A-49-50].

P2P was known at the time of the filing of their application and that they did not invent P2P itself, however.[7]  The claims do not attempt to cover P2P itself but only a particular use of P2P technology.

The only networks disclosed in the specification are peer networks, and indeed, the specification states clearly that hierarchical networks are *not* the invention.  Evidence of this is found throughout the specifications of the Asserted Patents.  First, each of the abstracts of the Asserted Patents describes the alleged invention(s) as a peer-to-peer network, either explicitly or implicitly.  The abstract of the'508 Patent (the first-filed Asserted Patent) describes "[m]ethods and systems … for providing receiver-driven streaming of an item of content in a *peer-to-peer network* comprising a receiver *peer node* and a plurality of *transmitter peer nodes*."[8]  The later-filed applications do not necessarily use the word "peer" in their abstracts, but implicitly describe peer-to-peer networks: the '752 Patent abstract describes "[s]ystems and apparatus… for distributing media content from a first media player to other media players that include a second media player" wherein "the first media player may output at least a part of the media content to the first stream target while the second media player outputs at least a part of the media content to a second stream target";[9] the '138 Patent abstract describes searching for and building a network of peers to enable streaming of content between peers;[10] the '862 Patent abstract describes "streaming content over a network that enables communication between" peer consumer nodes such that play-back of content at a receiving peer node occur as another part of the content is being received;[11] the '513 Patent abstract describes "[s]ystems and methods … for

_____

[7] *See* '508 Patent at 2:19-21 [A-46] ("numerous applications of so-called peer-to-peer networks that may or may not have client/server technology are known").

[8] *Id*. at Abstract [A-1] (emphasis added).

[9] '752 Patent Abstract [A-55].

[10] '138 Patent Abstract [A-110] ("The invention relates to a device for either generating or maintaining an organic data network having an [sic] dynamic topology…  Additionally the invention relates to a method and software for data packages received from a transmitting device to at least one receiving device, independent of said transmitting device."); *see also, e.g.*, '138 Patent, claim 22 [A-170].

[11] '862 Patent Abstract [A-171] ("Systems and methods are disclosed for streaming content over a network that enables communication between a first consumer node, a second consumer node,

4

streaming content" from one or more peer nodes and wherein "[t]he method includes autonomously identifying one or more other media player systems";[12] and the '315 Patent abstract describes "[s]ystems and methods … for streaming content over a network that enables communication" between peer nodes and which method also includes making incoming content received from one of the peer nodes ready for processing and play-back while allowing simultaneous receipt of the content from other peers.[13]

Second, the specification makes numerous references to "the invention" and to the "device according to the invention" before describing what the alleged invention is. *See, e.g.*, '508 Patent at 1:54-56 [A-46] ("It is an object of the invention to at least partially remove the drawbacks mentioned explicitly or implicitly. To that end the invention provides…"); 2:24 [A-46] ("like in the device according to the invention…"); 4:54-55 [A-47] ("In an organic data network that can be built up and maintained by means of a device according to the invention…"). In each of those instances, which occur in the "Summary of the Invention" section of the specification,[14] the patentees continue to describe a P2P network comprising peer nodes. "When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention."[15] The public is entitled to take the patentees of the Asserted Patents at their word.[16]

---

and a production node… The method also includes making incoming content received from the second consumer node ready for processing and play-back at the first consumer node, so that part of the content is streamed to a stream target at the first consumer node, while another part of the content is being received from the production node.").

[12] '513 Patent Abstract [A-231].

[13] '315 Patent Abstract [A-293].

[14] *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Although a statement's location is not 'determinative,' the location can signal the likelihood that the statement will support a limiting definition of a claim term… Statements that describe the invention as a whole are more likely to be found in certain sections of the specification, such as the Summary of the Invention.").

[15] *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (finding that a patent's description of the "gateway system of the 'present invention'" as a "gateway [that] compresses and decompresses voice frequency communication signals and sends and receives the compressed signals in packet form via the network" necessarily limited the term "localized wireless gateway system" to one "performing compression and packetization functions at the gateway."). *See also Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir.

Hierarchical networks are described as the prior art, and the "overhead structures" inherent in such systems were viewed by the patentees as drawbacks requiring removal.[17]  In the Background of the Invention section, the patentees described a network of nodes in a prior art patent, pointing out that the "nodes, however, are each part of a *hierarchic system*.  Each node is *centrally controlled* here by means of a central node."[18]  The specification discusses another prior art reference that discloses a multi-agent system, but denigrates that reference because one agent "is *hierarchically placed* below the original agent."[19]  In other words, the applicants distinguished their invention from prior art hierarchical systems and from systems that rely on central control.[20]

The patentees described the alleged inventions as a network of "independent devices," i.e., peer devices, as opposed to the hierarchical systems of the prior art.  For instance, the patentees described how the alleged invention builds an "organic network" from a number of peer nodes, which may be "adapted such that the node can change type by means of the software, or may even be several types at the same time" so as to achieve "a maximum flexibility of the organic network."[21]  "Central in the network are the consumer nodes,"[22] which, when connected together, create a data network.[23]

---

2004) (finding that clear statements of what "the present system" was in the specification precluded a finding broadening the scope to packet-switched networks).

[16] *Honeywell Int'l, Inc. v. ITT Indus.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) ("Here, the written description uses language that leads us to the conclusion that a fuel filter is the only 'fuel injection system component' that the claims cover, and that a fuel filter was not merely discussed as a preferred embodiment.  On at least four occasions, the written description refers to the fuel filter as 'this invention' or the 'present invention' … The public is entitled to take the patentee at his word…").

[17] '508 Patent at 1:40-47; 1:54-55 [A-46].

[18] *Id.* at 1:36-39 [A-46] (emphasis added).

[19] *Id.* at 1:4-5 [A-46] (emphasis added).

[20] *See Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004) ("Where the general summary or description of the invention describes a feature of the invention… and criticizes other products… that lack the same feature, this operates as a clear disavowal of these other products (and processes using these products).").

[21] '508 Patent at 4:54-61 [A-47].  *See also id.* at 5:16-6:20 [A-48].

[22] *Id.* at 5:3 [A-48].

[23] *Id.* at 6:4-5 [A-48] ("With a growing number of consumer nodes a data network is created.").

Making clear their intent to disclaim hierarchical networks and to claim non-hierarchical P2P networks, the patentees write, "it is possible to build up a data network *without hierarchy, in contrast to the classic networks and the internet*."[24]  The patentees do acknowledge that some P2P networks "may or may not have client/server technology."[25]  However, in the very next paragraph, they dispel any notion that the Asserted Patents claim such a network but instead claims a network of equal peers:

> However, an organic network having a dynamic topology wherein data transfer between server and client takes place like in the device according to the invention, *is not described in them*.  In conformity with the device according to the invention it is namely possible that the *same peer* at one moment acts as server having a second peer as client and at another moment acts as client of the *second peer* now acting as server, *without a control being at the basis thereof*.  The two devices change role on their own initiative.[26]

The specification also discusses one of the alleged advantages of the P2P network of the patents over hierarchical networks: greater robustness because it does not contain a potential point of failure — the server.  "[W]hen a server fails [in a hierarchical network] or gets overloaded very many computers drop off the network.  It is possible therefore, using a device according to the invention, to build or maintain a network having a very low failure sensitivity."[27]

The specification is clear.  Hierarchical networks are the prior art and are not the invention.  Instead, the alleged invention is a specific type of P2P network that is disclosed and claimed in the Asserted Patents.  Based on these statements, the claimed invention cannot cover hierarchical networks or networks other than P2P networks.  To find otherwise would impermissibly broaden the scope of the purported inventions and contradict the very words the patentees used to describe the systems disclosed in the Asserted Patents.

---

[24] '508 Patent at 2:10-12 [A-46] (emphasis added).

[25] *Id.* at 2:19-21 [A-46].

[26] *Id.* at 2:22-30 [A-46] (emphasis added).

[27] *Id.* at 2:12-15 [A-46].

7

## III.    LEGAL STANDARDS

Claim construction, a matter of law for the Court, is the first step in any infringement or validity analysis.[28]  A district court should construe the claims in light of their language as informed by their preambles, as well as the patent's specification, and prosecution history.[29]

The claim language should guide the Court's constructions, thus the context in which a term is used in an asserted claim "can be highly instructive."[30]  The specification is the "best source for understanding a technical term," to be supplemented, "as needed, by the prosecution history."[31]  Indeed, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone."[32]  The prosecution history represents key evidence of how the examiner and the inventor construed the patent.[33]  The prosecution history "consists of the complete record of the proceedings before the PTO," which provides evidence of how the "inventor understood the patent" and explained it.[34]  Although expert testimony may illuminate the written description and the prosecution history, it should not be accepted if it conflicts with the other claims, the written description, or the prosecution history, as the written record of the patent.[35]

---

[28] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

[29] *Markman*, 52 F.3d at 980; *see also Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966) ("[A]n invention is construed not only in light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office.").

[30] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).

[31] *Phillips*, 415 F.3d at 1315 (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed Cir. 1998)); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (specification is "highly relevant to the claim construction analysis," usually "dispositive," and "the single best guide to the meaning of a disputed term").

[32] *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

[33] *See Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992).

[34] *Phillips*, 415 F.3d at 1317.

[35] *See Kara Tech., Inc., v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009).

Claims should generally be interpreted in a manner consistent with other claims, as well as with the prosecution history.[36]   Moreover, the claim terms in related patents sharing a common specification and application should usually be given the same interpretation.[37]   "Where patents-in-suit all derive from the same parent application and share many common terms, the Court must interpret the claim consistently across all asserted patents."[38]

While the patentee may elect to be his own lexicographer, any special definition given to a term must be clearly provided in the specification.[39]   A patentee may also impliedly redefine a claim term by using a second term as an alternative.[40]   However, the "implied redefinition must be so clear that it equates to an explicit one."[41]   Further, a patentee's statements disavowing claim scope during prosecution serve to limit scope.[42]   Disavowals made during the prosecution of ancestor patent applications may also limit the scope of a claim.[43]

Extrinsic evidence may also be relevant to claim construction.[44]   Such evidence consists of all evidence extrinsic to the patent and its prosecution history, including "expert and inventor testimony, dictionaries, and learned treatises."[45]   While authorizing examination of extrinsic

---

[36] *See, e.g., Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701 (Fed. Cir. 1998).

[37] *See, e.g., NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005), *reh'g en banc denied; Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004), *reh'g en banc denied.*

[38] *TDM Am., LLC v. U.S.*, 85 Fed. Cl. 774, 788 (Fed. Cl. 2009).

[39] *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) (when the patentee "has elected to be a lexicographer by providing an explicit definition in the specification for a claim term[,]… the definition selected by the patent applicant controls"); *see also Housey Pharms, Inc. v. Astrazeneca UK Ltd.*, 366 F.3d 1348, 1352 (Fed. Cir. 2004).

[40] *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012).

[41] *Id.* (internal citations omitted).

[42] *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008*); see also Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1379 (Fed. Cir. 1998) (A patentee relinquishing subject matter to distinguish prior art cannot escape reliance by a defendant upon the surrender of subject matter.) (internal cites omitted); *see also Astrazeneca AB*, 384 F.3d at 1340.

[43] *Ormco Corp. v. Align Technology, Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007) (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1333 (Fed. Cir. 2003)).

[44] *Phillips*, 415 F.3d at 1317.

[45] *Id.* (internal quotation omitted).

evidence, the Federal Circuit has warned that, while it "can shed useful light on the relevant art," it is "less significant than the intrinsic record in determining the legally operative meaning of claim language."[46]

## IV.   ARGUMENT

### A. Disputed Constructions

The parties continue to dispute the constructions of the following terms.[47]

#### 1.   "Streaming (n.)"; "Streaming (adj.)"; and "Streamed"

| Term | Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|---|
| Streaming (noun) | The continuous transmission of data packages that are received by a receiver in sequential order and played by the receiver while the transmission is occurring | Transmission of content that may be played by the receiver while the transmission is occurring |
| Streaming (adj.) | Transmitted continuously and received in sequential order by a receiver and played by the receiver while the transmission is occurring | Transmitted and may be played by the receiver while the transmission is occurring |
| Streamed | Transmitted continuously and received in sequential order by a receiver and played by the receiver while the transmission is occurring | Transmitted and may be played by the receiver while the transmission is occurring |

Although the parties acknowledge that a transmission is required by the terms "streaming (n.)," "streaming (adj.)," and "streamed" (collectively, "streaming"), the parties dispute (1) whether "data packages" are transmitted; (2) whether the transmission of data packages is continuous; (3) whether the data packages are received by a receiver in sequential order; and (4) whether the data packages are played by the receiver while the transmission is occurring. Because Spotify's proposed constructions are supported by the specification as well as statements made by the patentees during prosecution, which requires "streaming" to include each of the four listed limitations, the Court should adopt Spotify's proposed constructions.

---

[46] *Phillips*, 415 F.3d at 1317 (internal quotation omitted).
[47] *See, generally*, Ex. B to the parties' Joint Claim Construction Chart (Doc. 36-2).

### a.    Streaming Requires the Transmission of Data Packages

The specification makes numerous references regarding the transmission of data packages.  Indeed, the specification provides: "[i]n case of a streaming audio or video application the sequential order of several *data packages* is of importance because en route delaying during the transmission of a *data package* results in an irregular broadcast."[48]  The patentee continues:

> [s]treaming video and streaming audio are known internet applications in *which data packages with contents are transmitted* from a server or station to clients or consumers. The special thing about these *data packages* is that *the time sequence of the various packages is of importance*: a radio broadcast, for instance, has a fixed time line. Additionally the continuity of data flow is of importance, as otherwise the broadcast will falter.[49]

Nonend argues that "streaming" requires the transmission of "content" as opposed to data packages, but apparently ignores the patents' definition of "content" as being comprised of data packages.[50]  Further, there can be no serious dispute that the alleged inventions disclosed in the Asserted Patents pertain to networks such as the Internet, or other similarly organized networks, all of which involve the receipt and transfer of discrete units of data.  Thus, "streaming" involves the transmission of "data packages."

### b.    Streaming Requires Continuous Transmission

The specification emphasizes that continuity of data during streaming is "of importance," as evident from the quotation discussed in the preceding subsection of this brief, because "otherwise the broadcast will falter."[51]  The specification further warns that a stable data connection during data transfer is "of great importance" when streaming media content.[52]

---

[48] '508 Patent at 2:40-43 [A-46] (emphasis added).

[49] *Id.* at 7:2-10 [A-49] (emphasis added).

[50] *Id.* at 2:38-40 [A-46] ("Content namely is generally divided into smaller data packages, [sic] that are subsequently transmitted.").

[51] *Id.* at 7:2-10 [A-49].

[52] *Id.* at 6:12-16 [A-48] ("During data transfer, particularly during data transfer wherein the sequential order is of importance, such as for instance streaming audio and streaming video in internet applications, an optimal data connection is of great importance.").

11

c.      **Streaming Requires the Sequential Receipt of Data Packages**

The patentees also required the correct sequential receipt of data packages during streaming in several places in the specification.[53]  The receipt of data packages in sequential order (and only sequential order) is also depicted in Figures 6A-K, which "may for instance be streaming video or audio."[54]

d.      **Streaming Requires that Receiver Play Data Packages While the Transmission is Occurring**

Nonend argues that a receiver "may" play content while the transmission is occurring. This permissive language, however, is incorrect; streaming, as defined by the patentees, requires that a receiver play the content or data as the transmission is occurring.  Indeed, in order to traverse prior art, the patentees argued that the prior art (which permitted playback of music at the user's leisure) did not disclose "streaming":

> As a preliminary matter, Applicant submits that Henzerling does not even disclose "streaming content," as recited in each of the independent claims.  Henzerling also fails to teach or suggest making streaming content "ready for play-back," as recited in the pending claims.  Instead, Henzerling deals with the traditional transmission and receipt of entire data files, albeit between music players.  ***"Once stored in memory 52, the user may play the music file at his leisure."*** (Henzerling, col. 3, lines 63-64.)  Thus, in Henzerling's music players, only after an entire file has been downloaded may it be made ready for play-back or transmission.[55]

The file history is here describing and distinguishing the claimed invention from the prior art, and the way in which music was typically shared at the time of filing.  A user at that time using, for example, the then-common Napster service would have downloaded a requested song and then "play[ed] the music file at his leisure."  The patentees define "streaming" as something other than receiving a song or data packages for playback.  Nonend apparently seeks, through its

---

[53] *See, e.g.,* '508 Patent at 2:40-42 [A-46] ("In case of a streaming audio or video application ***the sequential order of several data packages is of importance*** because en route delaying during the transmission of a data package results in an irregular broadcast.") (emphasis added); 6:12-16 [A-48] ("During data transfer, particularly during data transfer ***wherein the sequential order is of importance, such as for instance streaming audio and streaming video*** in internet applications, an optimal data connection is of great importance.") (emphasis added); *see also* 7:2-10 [A-49]).
[54] *Id.* at 11:40-41 [A-51].
[55] *See* '138 Patent file history, Jan. 5, 2010 Amendment, p. 15 [A-1972] (underlining in original) (emphasis added).

proposed construction, an argument that its claims encompass downloading a song for later playback as was done in the prior art. This was clearly disclaimed in the file history in light of the Henzerling prior art.

Because Spotify's constructions adhere closely to the language used by the patentees to define the "streaming" terms, the Court should adopt Spotify's proposed constructions.

### 2. "Peer node"

| Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|
| A node in a network that can act as a transmitter (server) of data packages at one moment or as a receiver (client) of data packages at another moment and change its role on its own initiative | No definition required – plain and ordinary meaning |

Spotify's proposed construction of this term is grounded in the language used by the patentees to define it in the specification:

> In conformity with the device according to the invention it is namely possible that the same peer at one moment acts as a server having a second peer as client and at another moment acts as client of the second peer now acting as server, without a control being at the basis thereof. The two devices change role on their own initiative.[56]

The patentees further define a peer node as one that can "change type by means of the software, or may even be several types at the same time."[57] This is the essence of what a peer node is — each peer node is equal to any other peer node because each can perform the functions of all others. This fully comports with the standard dictionary definition of "peer" — "one that is of equal standing with another"[58] — but applies it to the special case of computer networks.

As far as Spotify is aware, Nonend does not dispute the definition of the term. Nevertheless, Nonend asks the Court to refrain from providing any definition at all. Nonend ignores what the Asserted Patents themselves have to say about this term. Moreover, a lay jury will not have an understanding of the use of the term in the specialized context of computer networking; a definition will assist the jury and avoid confusion.

---

[56] '508 Patent at 2:25-30 [A-46].
[57] Id. at 4:58-60 [A-47].
[58] Merriam-Webster's Collegiate Dictionary (11th ed., 2003), at 913 [A-3062].

13

### 3.    "Device"

| Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|
| A peer node | No definition required – plain and ordinary meaning |

It is evident from reading the specification that the patentees intended to equate a "device" of the claims with a "peer node," and that the terms are used interchangeably. Numerous passages in the specification establish this equivalence, requiring a construction in lieu of the ambiguity created by which Nonend's "plain and ordinary meaning." *Thorner*, 669 F.3d at 1368. "Devices," according to the patentees, comprise the peer nodes of a network.

> By choosing such a device an organic data network can be built up or created in which independent devices according to the invention are able to provide other independent devices according to the invention with data so that for instance data that are available to a network are quickly accessible to any give[n] device in a network.[59]

Further, the specification ascribes various attributes to a "device" which describe attributes of a peer node. For example, a "device" according to the Asserted Patents is provided with "a transmission routine for transmitting data packages to receiving devices."[60] "Devices" have the ability to make an inventory of a number of other devices in the data network and try out the connection to another device on the data network for "transmitting and/or receiving when existing connections are broken off or come below a threshold value."[61] The patentees also intended that "devices" have network addresses.[62] Tellingly, patentees also wrote that "[a] possible device according to the invention is a consumer node."[63] As noted above, consumer nodes (a type of peer node) are central to the network described in the Asserted Patents.[64]

---

[59] '508 Patent at 2:4-9 [A-46]. *See also, e.g., id.* at 2:13-15 [A-46] ("It is possible therefore, using a device according to the invention, to build or maintain a network having a very low failure sensitivity."); 2:25-30 [A-46] ("In conformity with the device according to the invention it is namely possible that the same peer at one moment acts as a server... and at another moment acts as [a] client...").

[60] *Id.* at 3:8-11 [A-47].

[61] *Id.* at 3:24-26 [A-47].

[62] *Id.* at 3:27-29 [A-47]. ("In the same or another embodiment of the invention, the device is provided with a memory for storing a data network address of at least one other device in the data network."). *See also id.* at 3:35-40.

[63] *Id.* at 4:51-52 [A-47].

[64] *Id.* at 5:3 [A-48].

14

That Nonend argues that a "device" is not a peer node also ignores the prosecution history. In the USPTO's April 27, 2009 Notice of Allowance, the Examiner wrote: "Examiner interprets… the limitation 'peer node' as a device."[65] That the Examiner determined it necessary to provide the definition under which the claims were allowed demonstrates that the claim term should be construed now to avoid ambiguity later. Within the context of the Asserted Patents, a "device" is a peer node; the Court should construe it as such.

### 4.   "Production node"

| Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|
| A peer node that transmits content to other nodes when they request such | A node that initially provides the content to the network and can transmit content to another node when requested |

Again, Spotify relies on the patentees' own language in support of its proposed construction. The patentees write, "[t]he first node is a node transmitting content to other nodes when they request such. Such a node is further called a production node."[66] Further, "[a] production node is a device according to the invention the purpose of which is to make the content, either generated or present in the device itself, available to one or more other devices."[67] Nonend's proposal modifies the express language in the specification; it should be rejected.

Spotify includes the term "peer node" in the definition to make clear that any node claimed by the Asserted Patents must be a peer node. Because the patentees explicitly disclaimed hierarchic systems from their alleged inventions and stated that the alleged invention involved a peer-to-peer network (see Section II.B., above), all nodes recited by the claims (including "production node") must also be peer nodes. The various names ("production node," "consumer node," "portal node") are merely functional descriptions of what the peer node is doing at a particular time. As the patent states, a node "at one moment" has one function and "at another moment" has a different function; nodes "can change role on their own initiative." '508

---

[65] '508 Patent file history, April 27, 2009 Notice of Allowance at p. 2 [A-456].

[66] '508 Patent at 4:62-64 [A-47].

[67] *Id.* at 7:15-20 [A-49]; *see also id.* at 8:42-44 [A-49] ("The production node delivers content for instance a streaming audio broadcast via the internet to two consumer nodes 2 and 2'.").

Patent at 2:25-30.  Moreover, without the requirement that a production node be a peer node, a production node can be interpreted as a central node in a hierarchic system, which is precisely what was disclaimed by the patentees.

### 5. "Central node"

| Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|
| A node that controls other nodes in a hierarchic system | A node that controls data transmission among other nodes in a hierarchic system |

As a preliminary matter, the term "central node" only appears in claim 38 of the '513 Patent, where it is used in the negative: "[t]he method of claim 33, wherein none of the other media players is a central node." [A-291]  According to the patentees, a central node would be part of a hierarchic system: "[a]dditionally a network… of nodes is known from U.S. Pat. No. 5,511,167 which nodes, however, are each part of a hierarchic system. *Each node is centrally controlled here by means of a central node.*"[68]  Additionally, in describing the alleged inventions of the Asserted Patents, the patentees write: "[p]referably there generally is no question of central control here, so that flexibility and failure sensitivity are reduced."[69]  Thus, a central node, as contemplated by the patentees, is capable of controlling other nodes in a hierarchic system, and is therefore not part of the alleged invention.

Nonend argues for a narrower definition of the term "central node," and limits a central node to "control[ling] data transmissions among other nodes in a hierarchic system."  However, Nonend does not provide intrinsic support for that narrow construction, which in any event, conflicts with the patentees' statement that "each node [in a hierarchic system] is centrally controlled… by means of a central node."  Although Spotify acknowledges that a central node *may* control the data transmissions among other nodes in a hierarchic system, a central node, as defined by the patentees, is not so limited.[70]

---

[68] '508 Patent at 1:36-39 [A-46] (emphasis added).

[69] *Id.* at 5:56-58 [A-48].

[70] Unlike all the other nodes which Spotify asks the Court to construe, Spotify does ***not*** ask the Court to interpret a "central node" as a peer node because the patent expressly states that a "central node" is a node in a prior art hierarchical network.  '508 Patent at 1:36-39 [A-46]. Nowhere in the claims or the specification is a "central node" alleged to be part of the invention.

### 6. "Consumer node"

| Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|
| A peer node that is provided with software to receive content and to deliver it to other nodes requesting such, independent of the source | A node that is provided with software to receive content and to deliver it to other nodes requesting such, independent of the source |

Here, the parties supply nearly identical proposed constructions for "consumer node." The only dispute the parties have is whether a consumer node is, as Spotify contends, a "peer node."[71] Again, Spotify includes the term "peer node" in the definition to make clear that any node claimed by the Asserted Patents must be a peer node. Because the patentees explicitly disclaimed hierarchic systems from their alleged inventions and stated that the alleged invention involved a peer-to-peer network (see Section II.B., above), all nodes recited by the claims (including "consumer nodes") must also be peer nodes.[72] Spotify's construction relies on the numerous statements made in the specification limiting the proper scope of the alleged inventions to P2P networks.[73] In contrast, Nonend's proposed construction ignores the proper scope of the alleged inventions.

### 7. "Peer-to-peer network"; "Peer system"; "Network"; "A system for distributing media content"; and "Network of media players"

| Term | Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|---|
| Peer-to-peer network | A network of peer nodes | No definition required – plain and ordinary meaning |
| Peer system | A peer-to-peer network | No definition required – plain and ordinary meaning |
| Network | A group of interconnected peer nodes | No definition required – plain and ordinary meaning |
| A system for distributing media content | A network of peer nodes used to transmit audio or video content | No definition required – plain and ordinary meaning |

---

[71] The parties agree that consumer nodes are "provided with software to receive content and to deliver it to other nodes requesting such independent of the source." *See* '508 Patent at 5:4-5 [A-48].

[72] As stated above, the patentees' various names ("production node," "consumer node," "portal node") for a peer node are merely functional descriptions of what the peer node is doing at a particular time.

[73] Indeed, the patentees state that "[a] possible device according to the invention is a consumer node." '508 Patent at 4:51-52 [A-47]. As discussed in Section IV.D.3 (the discussion of "device"), a device, as used in the context of the Asserted Patents, is a peer node.

17

| Network of media players | A group of interconnected peer nodes for connecting media players | No definition required – plain and ordinary meaning |

This group of terms involves "networks" and "systems."  Although the terms are varied, a single issue connects them all:  Because the patentees disclaimed hierarchic systems (see Section II.B, above), the Court should construe the "networks" or "systems" above to take into account such disclaimer by limiting them to P2P systems.  Without a P2P limitation, the constructions of the above terms become impermissibly broader than what the patentees intended.

The abstract of the '508 Patent states that a "peer-to-peer network compris[es] a receiver peer node and a plurality of transmitter peer nodes."[74]  This fully supports Spotify's construction that a "peer-to-peer network" is a "network of peer nodes."  The next term, "peer system," is just another way of saying a group of peer nodes and should be construed as a "peer-to-peer network" for the same reasons.

With regard to the term "network," it is understood from the context of the Asserted Patents that the network claimed was a P2P network.  Further underscoring this understanding is the fact that the patentees equate a data network with a growing number of consumer (peer) nodes.[75]  "The larger the network becomes, i.e. the more nodes, the more capacity will be available and the quicker the network potentially may become, without expansion of the capacity of the server, by using the device according to the invention."[76]  Similarly, the Court should adopt Spotify's proposed construction of the terms "a system for distributing media content" and "network of media players," which take into account the P2P nature of the alleged inventions. [77]

---

[74] '508 Patent, Abstract [A-1].

[75] *Id.* at 6:4-5 [A-48].  *See also id.* at 6:31-34 [A-48] ("A production or consumer node having a limited transmission capacity can still transmit relatively much content over a ***network of many consumer nodes*** using its unused capacity.") (emphasis added).

[76] *Id.* at 6:24-28 [A-48].

[77] The USPTO also interpreted "media player" to mean a "device," which, as discussed above should be construed as a "peer node."  *See* '752 Patent file history, April 7, 2009 Notice of Allowance at p. 2 [A-1117] ("Examiner interprets… the limitation 'media player' as a device.").

18

### 8.   "Autonomously"

| Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|
| On its own initiative and independent of other nodes | No definition required – plain and ordinary meaning |

Here, Spotify again relies on the patentees' own words in advancing its proposed construction for "autonomously." The specification uses this term in several places:[78] "[s]pecial however is that the consumer node is able to act entirely autonomous and ***independent of the production node***."[79] Further, the patentees wrote, "[a] new node might ***at its own initiative***, entirely autonomously, go look for an even better connection."[80] The patentees further underscored that in order for something to act autonomously, it must do so without the intervention of anything else.[81]

### 9.   "First communication channel" and "Second communication channel"

| Term | Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|---|
| First communication channel | A first connection via a transmission medium to a first peer node | A first connection via a transmission medium |
| Second communication channel | A second connection via a transmission medium to a second peer node | A second connection via a transmission medium |

These terms appear in claims 1, 2, 5, 12, and 17 of the '862 Patent. Both parties agree that a "communication channel" is a "connection via a transmission medium." The only difference between the two proposals is Spotify's addition of what the communication channels are connected to – either a "first" or "second peer node." Nonend's proposal, which lacks these

---

[78] *See Renishaw*, 158 F.3d at 1249 (A patentee may impliedly redefine a term by using a second term as an alternative).

[79] '508 Patent, at 5:38-40 [A-48] (emphasis added).

[80] *Id.* at 5:50-51 [A-48] (emphasis added).

[81] *Id.* at 14:50-56 [A-52] ("The device according to the invention in all examples is autonomously capable of retrieving content from a data network, and sending it on to other devices according to the invention without the intervention of the transmitting side. Additionally each device is capable of testing whether a better connection is within reach, and entirely independently choosing whether to use said connection.").

limitations, should be rejected because it would expand the scope of the claims beyond what was contemplated by the '862 Patent.

Claim 1 of the '862 Patent recites a "receiving media player" and "two communication channels." Each communication channel is "operationally coupled to" the receiving media player. What claim 1 does not have, however, is an explicit statement of what the other ends of those communication channels are connected to. Read as broadly as Nonend proposes, claim 1 of the '862 Patent would allow a "media player" to be connected to anything via the "communication channels," including a dedicated content server.

Because the patentees clearly contemplated a P2P system, it follows that a "receiving media player" would necessarily be connected to its peers – other media players or nodes – and not a content server. Nonend's proposal would read the claims far more broadly than what the patentees' statements in the specification actually allow; by deliberately omitting the fact that a "receiving media player" must be attached to peer nodes via the first and second communication channels, Nonend seeks to expand the scope of claim 1 to encompass a system in which the "receiving media player" could be connected to content servers such as those present in traditional client/server architectures. This is impermissible.

Thus, in order to properly define the alleged inventions, it is necessary for the Court to include the limitations "to a first peer node" and "to a second peer node" in its constructions of "first communication channel" and "second communication channel," respectively.

## V.    CONCLUSION

For all of the foregoing reasons, Spotify respectfully requests that its proposed claim constructions be adopted, and for such other and further relief to which it may show itself entitled.

20

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Henry C. Bunsow                        By: /s/ Philip A. Rovner
Craig Y. Allison                              Philip A. Rovner (#3215)
Alden K. Lee                                  Jonathan A. Choa (#5319)
Aaron R. Hand                                 Hercules Plaza
BUNSOW, DE MORY, SMITH & ALLISON LLP          P.O. Box 951
55 Francisco Street, Suite 600                Wilmington, DE  19899
San Francisco, CA  94133                      (302) 984-6000
(415) 426-4747                                provner@potteranderson.com
                                              jchoa@potteranderson.com

Dated:  October 18, 2013               *Attorneys for Defendants*
1127008                                *Spotify USA Inc., Spotify Limited, Spotify*
                                       *Technology S.A. and Spotify AB*

21

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on October 18, 2013, the within document was

filed with the Clerk of the Court using CM/ECF which will send notification to the registered

attorneys of record that the document has been filed and is available for viewing and

downloading.

I further certify that on October 18, 2013, the within document was electronically mailed

to the following persons:

Stamatios Stamoulis, Esq.
Richard C. Weinblatt, Esq.
Stamoulis & Weinblatt LLC
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809
Stamoulis@swdelaw.com
Weinblatt@swdelaw.com

*Attorneys for Plaintiff*

Richard C. Vasquez, Esq.
Eric W. Benisek, Esq.
Jeffrey T. Lindgren, Esq.
Robert  McArthur, Esq.
Stephen C. Steinberg, Esq.
Padraig O'Connor
Dee S. Gray
Vasquez Benisek & Lindgren LLP
3685 Mt. Diablo Boulevard
Suite 300
Lafayette, CA 94549
rvasquez@vbllaw.com
ebenisek@vbllaw.com
jlindgren@vbllaw.com
mcarthur@vbllaw.com
ssteinberg@vbllaw.com
poconnor@vbllaw.com
dgray@vbllaw.com

*Co-Counsel for Plaintiff*

/s/ Philip A. Rovner
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
provner@potteranderson.com