# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NONEND INVENTIONS N.V.,           )
                                  )
            Plaintiff,            )        Civil Action No. 12-1041-GMS
                                  )
      v.                          )        JURY TRIAL DEMANDED
                                  )
SPOTIFY USA INC., *et al.,*        )
                                  )
            Defendants.           )

## DEFENDANTS SPOTIFY USA INC., SPOTIFY LIMITED, SPOTIFY TECHNOLOGY S.A., AND SPOTIFY AB'S RESPONSIVE *MARKMAN* BRIEF

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

OF COUNSEL:

Henry C. Bunsow
Craig Y. Allison
Alden K. Lee
Aaron R. Hand
BUNSOW, DE MORY, SMITH & ALLISON LLP
351 California Street
Suite 200
San Francisco, CA 94104
(415) 426-4747

*Attorneys for Defendants*
*Spotify USA Inc., Spotify Limited, Spotify*
*Technology S.A. and Spotify AB*

Dated:  November 15, 2013

# TABLE OF CONTENTS

PAGE

I.   ARGUMENT...................................................................................................1

   A.   Nonend Cannot Rebut the Fact that the Asserted Patents Cover P2P
        Technology Only ...................................................................................1

   B.   "Streaming (n.)"; "Streaming (adj.)"; and "Streamed" ...........................6

   C.   "Peer Node"............................................................................................8

   D.   "Device" .................................................................................................9

   E.   "Production node" ..................................................................................10

   F.   "Central node" .......................................................................................12

   G.   "Consumer node" ...................................................................................12

   H.   "Peer-to-peer network"; "Peer system"; "Network"; "A system for
        distributing media content"; and "network of media players" .............13

   I.   "Autonomously" ....................................................................................14

   J.   "First communication channel" and "Second communication channel"...............15

II.  CONCLUSION .............................................................................................16

# TABLE OF AUTHORITIES

PAGE

## Cases

*800 Adept, Inc. v. Murex Securities, Ltd.*,
  539 F.3d 1354 (Fed. Cir. 2008) ...........................................................................16

*AquaTex Indus. v. Techniche Solutions*,
  419 F.3d 1374 (Fed. Cir. 2005) ........................................................................2, 16

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
  388 F.3d 858 (Fed. Cir. 2004) .......................................................................2, 3, 7

*Carman Indus., Inc. v. Wahl*,
  724 F.2d 932 (Fed. Cir. 1983)...........................................................................11

*Carnegie Mellon Univ. v. Hoffman-La Roche Inc.*,
  541 F.3d 1115 (Fed. Cir. 2008) .........................................................................11

*Digital Biometrics, Inc. v. Identix, Inc.*,
  149 F.3d 1335 (Fed. Cir. 1998) ...........................................................................3

*Gentry Gallery v. Berkline Corp.*,
  134 F.3d 1473 (Fed. Cir. 1998) ...........................................................................4

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
  452 F.3d 1312 (Fed. Cir. 2006) ...........................................................................3

*Lizardtech, Inc. v. Earth Resource Mapping Pty Ltd.*,
  433 F.3d 1373 (Fed. Cir. 2006) ...........................................................................5

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
  357 F.3d 1340 (Fed. Cir. 2004) ...........................................................................3

*Nystrom v. TREX Co., Inc.*,
  424 F.3d 1136 (Fed. Cir. 2005) .........................................................................16

*Ocean Innovations, Inc. v. Archer*,
  145 Fed. Appx. 366 (Fed. Cir. 2005) ...................................................................2

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ..................................................................passim

*Powder Co. v. Powder Works*,
  98 U.S. 126 (1878) ..............................................................................................4

*Renishaw PLC v. Marposs Societa' per Azioni*,
   158 F.3d 1243 (Fed. Cir. 1998) ........................................................................6

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
   653 F.3d 1296 (Fed. Cir. 2011) ................................................................1, 2, 5

*Rhine v. Casio, Inc.*,
   183 F.3d 1342 (Fed. Cir. 1999) ......................................................................11

*Russell v. Dodge*,
   93 U.S. 460 (1877) ............................................................................................4

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007) ........................................................................3

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ..........................................................................6

# I.    ARGUMENT

In advancing its proposed constructions, Plaintiff Nonend Inventions, N.V. ("Nonend")

asks this Court to do two things: (1) ignore the intrinsic evidence, which necessarily limits the

purported inventions to peer-to-peer ("P2P") technology; and (2) rewrite the claims to

retrospectively reach systems that the claims were never intended to cover and were explicitly

disclaimed.  Indeed, Nonend proposes claim constructions that would fundamentally redefine the

alleged inventions disclosed in the Asserted Patents.  On the other hand, the claim constructions

proposed by Defendants Spotify USA Inc., Spotify Limited, Spotify Technology S.A., and

Spotify AB (collectively, "Spotify" or "Defendants") track the intrinsic evidence — actual

language used by the patentees to describe the disputed claim terms — and also account for the

entire context of the Asserted Patents.[1]  Because Nonend's proposed constructions impermissibly

seek to expand the scope of the claims of the Asserted Patents, and are contrary to the tenets of

claim construction, the Court should reject them and adopt Spotify's proposed constructions.

### A.    Nonend Cannot Rebut the Fact that the Asserted Patents Cover P2P Technology Only

As Spotify showed in its October 18, 2013 Opening *Markman* Brief ("Spotify's Opening

Brief") (D.I. 40), Nonend is asking the Court to consider the disputed claim terms in a vacuum,

without reference to the specification and other intrinsic evidence that is the best evidence of

what the claim terms mean.[2]  Rather than "allow the claim language to become divorced from

what the specification conveys is the invention," the Court should "strive to capture the scope of

the actual invention" by reviewing the intrinsic record.[3]  In this case, reading the asserted claims

---

[1] The Asserted Patents are U.S. Patent Nos. 7,587,508; 7,590,752; 7,779,138; 8,090,862; 8,099,513; and 8,266,315.

[2] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."); *see* Spotify's Opening Brief (D.I. 40) at 1-7 (discussing context of the Asserted Patents).

[3] *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (citing *Phillips*, 415 F.3d at 1323-24) (statements in specification, including to distinguish the prior art served as express disclaimer; "body" of syringe limited to a single structure (a quality expressly distinguished from the prior art) even though claims left of multi-part design).

in light of the specification and the rest of the intrinsic evidence necessarily leads one of ordinary skill in the art to conclude that the alleged invention(s) disclosed in the Asserted Patents relate solely to peer-to-peer ("P2P") technology.[4]  Not only does the specification teach a P2P network as a primary embodiment, it expressly disclaims alternatives, including hierarchical networks.[5] For example, the specification repeatedly defines "the invention" or the "device according to the invention" as being or comprising a P2P network.[6]  Given the patent applicants' repeated statements in the specification and in the prosecution history regarding P2P, Spotify's proposed constructions capture the true scope of the invention in its proposed constructions.[7]

Of particular note is the fact that the specification repeatedly uses the phrases "the invention," "the present invention" or "the device according to the invention" in connection with a description of the invention itself.[8]  Relatedly, the specification also uses those same phrases

---

[4] The Asserted Patents share substantially the same specification.  For ease of reference, Spotify will again refer to the specification of the '508 Patent as "the specification" or the "written description" unless otherwise specified.

[5] Spotify's Opening Brief (D.I. 40) at 3-4, 6-7; *see also* '508 Patent at 1:40-47 [A-46] (distinguishing prior art "multi-agent system" where "duplicate agent is hierarchically placed below the original agent"), 1:54-55 [A-46] (stating that the object of the invention is to "at least partially remove the drawbacks [of prior art hierarchical systems] mentioned explicitly or implicitly"), 2:10-12 [A-46] ("[I]t is possible to build up a data network without hierarchy, in contrast to the classic networks and the internet.").

[6] Spotify's Opening Brief (D.I. 40) at 5.

[7] *Retractable*, 653 F.3d at 1305; *see also AquaTex Indus. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005) (excluding natural fibers from the construction of "fiberfill batting material" based upon the teachings of the specification); *Ocean Innovations, Inc. v. Archer*, 145 Fed. Appx. 366, 371 (Fed. Cir. 2005) (construing "floatation units" as hollow due to the teachings of the specification); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 865-866 (Fed. Cir. 2004) (construing "plugs" as being pleated based upon global statements in the abstract and summary of the invention sections of the specification requiring pleats).

[8] *See, e.g.*, '508 Patent at 1:14-16 [A-46] ("The invention relates…"), 1:54-56 [A-46] ("It is an object of the invention to at least partially remove the drawbacks mentioned explicitly or implicitly.  To that end the invention provides a device for…"), 2:4-7 [A-46] ("By choosing such a device an organic data network can be built up or created in which independent devices according to the invention are able to provide other independent devices according to the invention…"), 2:13-15 [A-46] ("It is possible therefore, using a device according to the invention, to build or maintain a network having a very low failure sensitivity."), 2:25-26 [A-46] ("In conformity with the device according to the invention…"), 3:46-47 [A-47] ("The invention moreover relates to a method of setting up and maintaining an organic data network…"), 4:36-38 [A-47] ("The invention additionally relates to software for either generating or maintaining an organic data network having a dynamic topology…"), 4:54-56 [A-47] ("In an organic data

when distinguishing "the invention" from the prior art.[9]  Such global statements regarding the

nature of the invention "are more likely to support a limiting definition of a claim term."[10]

"Statements that describe the invention as a whole are more likely to be found in certain sections

of the specification, such as the Summary of the Invention."[11]  As in the Federal Circuit's *C.R.*

*Bard* case, the references to "the invention" in the instant matter appear in the Summary of the

Invention, signaling the inventors' intent that such statements accurately describe and

accordingly limit the scope of the claims.[12]  Put differently, it was the applicants' stated intent to

limit the scope of the Asserted Patents to P2P systems, and the claims should be construed

consistent with these statements: "The public is entitled to take the patentee at his word."[13]

"The invention" language was in the application for the original U.S. Patent No.

7,065,548 (the "'548 Patent") from which all of the Asserted Patents depend,[14] and is present in

the issued '508, '752, and '138 Patent specifications.  Nonend submitted amendments in the

later-filed applications that replaced such language in the specification.  The applicants' belated

attempt to purge references to "the invention" from the specifications of the later-filed Asserted

Patents (specifically the '862, '513, and '315 Patents) is a transparent attempt to expand the

scope of the later patents' claims beyond the original disclosure.[15]  The applicants submitted

---

network that can be built up and maintained by means of a device according to the invention, various types of nodes can be distinguished.").

[9] *See, e.g.*, '508 Patent at 2:22-25 [A-46] ("However, an organic network having a dynamic topology wherein data transfer between server and client takes place like in the device according to the invention, is not described in them.").

[10] *C.R. Bard*, 388 F.3d at 864-866 (citing *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998) (finding that "[s]tatements of general applicability clearly define the claimed plug as 'having' or 'including a pleated surface'").

[11] *Id.* (citing *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004); *see also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (finding that the description of the "present invention" by the patentees limited the invention to the description); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (relying on "at least four occasions" where the written description referred to "this invention" or "the present invention").

[12] *See generally* '508 Patent at cols. 1 to 7 [A-46-49].

[13] *Honeywell*, 452 F.3d at 1318.

[14] *See, e.g.*, '548 Patent at 1:12-13, 1:53-56, 2:4-9, 2:21-24, 2:24-25, 3:45-48 [A-4305-4306].

[15] Each of the Asserted Patents was examined by the same examiner, Philip B. Tran, who did not apparently challenge applicants' attempts to replace the "the invention" language.

their amendments beginning in 2011, scrubbing their "the invention" language from the later-filed patents in favor of less restrictive language (e.g., "disclosed embodiments" and the like).[16] The specifications were not otherwise substantively modified. These changes cannot broaden the inventions claimed in the '862, '513, or '315 Patents to embrace any subject matter disclaimed through the applicant's use of the stricken language without rendering such claims invalid for lack of written description.[17]   Nonend's attempts to remove that critical language serves as an admission: Nonend understood its legal effect and sought to broaden its disclosure to support its broadened claims, unable to resist a temptation about which the Supreme Court long ago warned in barring the addition of matter not within the original disclosure.[18]

Even Nonend acknowledges that the Asserted Patents cover only P2P technology. In its opening claim construction brief, Nonend describes the Asserted Patents as "involv[ing] distributed computing where independent computers or nodes in the network function cooperatively to achieve... the distribution of data."[19]   Nonend further contrasts the goals of the alleged invention(s) with "centralized computing," which, according to Nonend, concentrates computational activity "in a terminal server to which clients are attached."[20]   Nonend describes the nodes, which comprise the claimed "organic network with a dynamic topology," as being "provided with different software modules that allow it to perform roles of, for example, a production node, consumer node, router node or portal node."[21]   According to Nonend, the

---

[16] *See* '513 Patent file history, February 17, 2011 Amendment at 5-8 [A-3323-3326]; '315 Patent file history, February 17, 2011 Amendment at 4-8 [A-3727-3731]; '862 Patent file history, October 5, 2011 Amendment at 4-7 [A-4188-4191].

[17] *E.g., Russell v. Dodge*, 93 U.S. 460, 463 (1877) (changes to specification to remove limiting language and make a condition a mere matter of convenience constituted new matter that improperly operated to enlarge the character and scope of the invention); *Gentry Gallery v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) (enlarging the scope of the invention, for example, by removing an essential element of the invention, renders claims invalid).

[18] *Powder Co. v. Powder Works*, 98 U.S. 126, 138 (1878) ("The danger to be provided against was the temptation to amend a patent so as to cover improvements which might have come into use, or might have been invented by others, after its issue.").

[19] October 18, 2013 Plaintiff and Counterclaim Defendant Nonend Inventions N.V.'s Opening Claim Construction Brief ("Nonend's Opening Brief") (D.I. 39) at 2.

[20] Nonend's Opening Brief (D.I. 39) at 2.

[21] *Id.*

4

claims asserted against Spotify are "directed to the distribution of streaming data or content among the nodes of the network."[22]  Although Nonend carefully refrains from using the phrase "peer-to-peer," the description Nonend provides in its brief is of a peer-to-peer network, i.e., a network of independent nodes that change roles as needed and can function cooperatively to distribute data among the nodes, as contrasted to a hierarchical or centralized network, which concentrates computational activity in a server.

However, in spite of the P2P teachings of the specification, and the many statements of what "the invention" is or what a "device according to the invention" can do (before such terms were scrubbed from the specifications of the later patents), Nonend advances constructions that ignore "what the specification conveys is the invention."[23]  Indeed, Nonend repeatedly offers constructions which ignore the P2P nature of the alleged invention(s).[24]  Nonend also declines to offer any construction that would aid the jury's inquiry for eight of the sixteen disputed terms, and insists that the plain and ordinary meaning should apply to those terms.[25]  Given the patent applicants' delineation of the claimed invention(s), as well as the disclaimers in the intrinsic evidence to overcome prior art, such constructions would either (1) simply ignore what the patent applicants intended the terms to mean; or (2) impermissibly expand the scope of the claims to cover that which was explicitly disclaimed by the applicants and contrary to what was actually disclosed.[26]

---

[22] *Id.*

[23] *Retractable*, 653 F.3d at 1305 (citing *Phillips*, 415 F.3d at 1323-24).

[24] *E.g.*, Nonend's Opening Brief (D.I. 39) at 8-9 (ignoring that the disputed "communication channels" are connected to peers), 10-11 (arguing that a "peer" limitation for the disputed term "production node" is "unsupported by the specification"), 12 (ignoring P2P disclosures for "consumer node"), 17 (criticizing Spotify's construction of "peer node" and "device" without offering a construction that would aid the jury).

[25] Nonend's Opening Brief (D.I. 39) at 13-15 ("network," "peer-to-peer network," and "network of media players"), 15-17 ("peer system" and "system for distributing media content"), 17-18 ("peer node" and "device"), 19-20 ("autonomously").

[26] *See Lizardtech, Inc. v. Earth Resource Mapping Pty Ltd.*, 433 F.3d 1373, 1375 (Fed. Cir. 2006), rehearing en banc denied, (Lourie, J., concurring) ("Claims are not necessarily limited to preferred embodiments but, if there are no other embodiments, and no other disclosure, then they may be so limited… [M]erely calling an embodiment 'preferred,' when there are no others, does not entitle one to claims broader than the disclosure.").

Accordingly, the Court should reject Nonend's proposed constructions and adopt Spotify's.

**B.**     **"Streaming (n.)"; "Streaming (adj.)"; and "Streamed"**

| Term | Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|---|
| Streaming (noun) | The continuous transmission of data packages that are received by a receiver in sequential order and played by the receiver while the transmission is occurring | Transmission of content that may be played by the receiver while the transmission is occurring |
| Streaming (adj.) | Transmitted continuously and received in sequential order by a receiver and played by the receiver while the transmission is occurring | Transmitted and may be played by the receiver while the transmission is occurring |
| Streamed | Transmitted continuously and received in sequential order by a receiver and played by the receiver while the transmission is occurring | Transmitted and may be played by the receiver while the transmission is occurring |

As a preliminary matter, Nonend is not entirely correct in asserting that the "specification does not define streaming."[27]  It is true that the specification never states that "the word 'streaming' is defined to be . . ."  But, as demonstrated in Spotify's Opening Brief, the specification provides substantial information about what the applicants understood the term "streaming" to mean.[28]  As the Federal Circuit has pointed out, the specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."[29]  Indeed, Spotify's proposed constructions for the "streaming" terms rely upon the applicants' own words.[30]  As discussed in Spotify's Opening Brief, "streaming" as used in the Asserted Patents means the continuous transmission of data

---

[27] Nonend's Opening Brief (D.I. 39) at 5.
[28] Spotify's Opening Brief (D.I. 40) at 10-13.  Notably, the "streaming" terms are not self-defining; indeed, the parties have submitted competing constructions for the terms.
[29] *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).
[30] *E.g.*, *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) (when the patentee "has elected to be a lexicographer by providing an explicit definition in the specification for a claim term[,]… the definition selected by the patent applicant controls.").

packages received by a receiver in sequential order and played by the receiver while the transmission is occurring.[31]

Spotify's proposed constructions also comport with dictionary definitions for the term "streaming." For example, the Merriam-Webster on-line dictionary defines "streaming" as "playing continuously as data is sent to a computer over the Internet" or "relating to or being the transfer of data (as audio or video material) in a continuous stream especially for immediate processing and playback."[32] Spotify's proposed constructions for the "streaming" terms simply restate the applicants' understanding of the terms, which, as it turns out, is not appreciably different from how dictionaries define the terms.

Nonend argues that Spotify's proposed constructions "inject descriptive language from the specification to unduly limit the claims' scope."[33] Nonend also argues that the language the patentees used to describe "streaming" were mere expressions of advantages or preferred embodiments.[34] However, the actual language of the specification goes beyond merely expressing advantages and/or preferred embodiments and instead makes global comments regarding what the applicants understood "streaming" to mean.[35] For example, the specification states that both the continuous nature and the sequential nature of streaming are "of importance" to streaming, and that without continuity of data flow, "the broadcast will falter."[36] Such comments provide a description of what the applicants understood streaming to be, and they do not describe merely permissive features.

The primary mischief in Nonend's proposed construction is that it does not clearly distinguish "streaming" from "downloading," although Nonend admits that its claims do not

---

[31] Spotify's Opening Brief (D.I. 40) at 10.

[32] *See, e.g., Streaming Definition*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/streaming (last visited Nov. 14, 2013).

[33] Nonend's Opening Brief (D.I. 39) at 5.

[34] *Id.* at 7.

[35] *C.R. Bard*, 388 F.3d at 865-866 ("[B]ecause the patent globally defined the plug as having a pleated surface, the term 'pleated' need not be repeated each time...").

[36] '508 Patent at 7:4-10 [A-49].

cover downloading and indeed argues that its proposed construction does not cover downloading. As Nonend is well aware, downloading is in the prior art, and there is nothing in the patents that suggests that the claims cover downloading. To take one example, Napster's music file sharing service, which predated the Nonend patents, allowed users to download music to be played at a later time. Other examples of file downloading (e.g., via a web browser or FTP) are legion. Downloading a song or media file to a computer for later playback is not streaming. Nonend's proposed definition, however, states that content "may" be played by the receiver while the transmission is occurring. In other words, the content may be played, or it may not. If the content is not being played, the content is being downloaded, not streamed. Nonend's construction thus opens up the possibility for Nonend to attempt to argue that downloading a song can be covered by the claims. For that reason, the use of the permissive "may" language in the construction of "streaming" should be rejected.

Nonend provides the example of a user who chooses to pause playback during receipt of data packages carrying content.[37] Even after playback is paused, data packages continue to be received by the node. Eventually, given a long enough pause, an entire data file is received. If the user then chooses to unpause playback, this is not functionally different from downloading an entire file prior to playback. Indeed, this scenario was one which the applicants sought to distinguish in the Henzerling reference.[38]

### C.    "Peer Node"

| Spotify's Proposed Construction | Nonend's Proposed Construction |
| --- | --- |
| A node in a network that can act as a transmitter (server) of data packages at one moment or as a receiver (client) of data packages at another moment and change its role on its own initiative | No definition required – plain and ordinary meaning |

As stated in Spotify's Opening Brief, the proposed construction of the term "peer node" is based upon the intrinsic evidence; the applicants explicitly defined the behavior and

---

[37] Nonend's Opening Brief (D.I. 39) at 7.
[38] Spotify's Opening Brief (D.I. 40) at 12-13.

characteristics of a "peer node" in the specification.[39]  Because the specification is the "single

best guide to the meaning of a disputed term," a person of ordinary skill in the art would have

and properly should have consulted it in order to ascertain what the applicants meant when they

used the term "peer node" in the claims.[40]  Contrary to Nonend's specious claim that there is no

basis to adopt Spotify's proposed construction, there is a firm basis for that construction – the

words the applicants themselves used to describe the alleged invention(s).  Thus, Spotify's

proposed construction of "peer node" comports with the Federal Circuit's directive to read the

claims in light of the specification, and accounts for the applicants' explicit definition of the

term.

      In contrast, Nonend insists without support that the plain and ordinary meaning of "peer

node" suffices.[41]  Instead of heeding the defining statements of the patent applicants with regard

to this term, Nonend contents itself with keeping the meaning of this term vague.  In addition, the

term should be defined to aid the jury in understanding the claims.  It is doubtful that a lay juror

will have an understanding of the technical implications of the term "peer node" as described in

the asserted patents; indeed, it is doubtful that most of the jurors will have heard of the term at

all.

      Because Spotify's proposed construction adheres to the tenets of claim construction, the

Court should adopt Spotify's construction.

    **D.**    **"Device"**

| Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|
| A peer node | No definition required – plain and ordinary meaning |

      In advancing its "plain and ordinary meaning" construction for the term "device,"

Nonend asks this Court to ignore the overall context of the specification, with its many

references to "the device according to the invention," to broaden the scope of what the patent

---

[39] *Id.* at 13.

[40] *Phillips*, 415 F.3d at 1315 (internal cites omitted).

[41] Nonend's Opening Brief (D.I. 39) at 18.

applicants actually claimed was the invention.[42]   On the other hand, Spotify's proposed

construction takes into account the intent of the patent applicants as evidenced by their repeated

references to "the device(s) according to the invention" and the corresponding descriptions of

peer nodes, or capabilities shared by peer nodes.[43]   Because the applicants modified the meaning

of the term "device," the Court should look to the intrinsic evidence as a guide to what the

applicants meant when they use the term "device."[44]   Doing so reveals that the proper

construction of "device" is a "peer node."[45]

Nonend attempts to expand the scope of the term "device" by pointing out that "'devices'

may comprise communication equipment, a media player (which can include a television, radio,

personal computer or other playback equipment) or mobile communication equipment (which

can include mobile phones, satellite telephones, pocket computers, PDAs, game computers and

other mobile equipment)."[46]   However, Nonend misses the point.  So long as each of those items

can perform as a "device according to the invention" (that is to say, a peer node), it does not

matter what form those "devices" take.  Nonend's enumeration of items that may function as

"devices" is not inconsistent with Spotify's proposed construction.

### E.    "Production node"

| Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|
| A peer node that transmits content to other nodes when they request such | A node that initially provides the content to the network and can transmit content to another node when requested |

The Court should not, as Nonend urges, ignore the full context of intrinsic evidence in

construing this term, which compels one of ordinary skill in the art to conclude that a production

node is a peer node.[47]   To exclude the "peer" aspect of a production node will impermissibly

---

[42] Nonend's Opening Brief (D.I. 39) at 17-18.  *See also* section I.A, above.

[43] Spotify's Opening Brief (D.I. 40) at 14-15.

[44] *Phillips*, 415 F.3d at 1315.

[45] Spotify's Opening Brief (D.I. 40) at 14.  Indeed, the Patent Examiner who examined each of the Asserted Patents construed "peer node" as a "device." *Id.* at 15.

[46] Nonend's Opening Brief (D.I. 39) at 17-18; *see also* '508 Patent at 4:14-29 [A-47].

[47] Spotify's Opening Brief (D.I. 40) at 3-7, 15-16.  Interestingly, Nonend ignores the fact that the patent applicants limited "the invention" to P2P networks while misleadingly representing to the

expand the scope of what a production node can be to include the very systems the applicants disclaimed in the specification – hierarchic server-client systems.[48] Defining a production node as a peer node adheres to the principle that a patentee is only allowed to claim that which he invented, and nothing more.[49] Because the patent applicants in this matter disclaimed hierarchic systems (repeatedly), it is imperative to make clear what the alleged invention actually is.

Further, there is no support for Nonend's requirement that a production node "initially provides the content to the network." Although Spotify acknowledges that a production node can "adapt the content, add content itself… or generate its own content," nothing about the cited passage[50] compels the Court to incorporate the "initially provides" limitation into the claim language. Additionally, it appears that with the addition of this limitation, Nonend seeks to expand the scope of the claimed invention(s) to include servers that may "initially provide content to a network" in hierarchic server-client architectures, which, again, was what the applicants had disclaimed.

Nonend also criticizes Spotify's construction of "production node" as "ensnar[ing] the definition of 'consumer node'… and thus conflate[ing the] meaning of the two distinct claim terms."[51] Nonend is mistaken; Spotify does not conflate the meaning of the two claim terms.

---

Court that "Nonend's construction reflects *all* the intrinsic evidence." Nonend's Opening Brief (D.I. 39) at 10 (emphasis in original).

[48] Spotify's Opening Brief (D.I. 40) at 3-7, 15-16.

[49] *Carnegie Mellon Univ. v. Hoffman-La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008) ("[A] patentee "can lawfully claim only what he has invented and described, and if he claims more his patent is void." … To satisfy the written description requirement, "the applicant does not have to utilize any particular form of disclosure to describe the subject matter claimed, but the description must clearly allow persons of ordinary skill in the art to recognize that he or she invented what is claimed.") (internal citations omitted). Because "[c]laims should be so construed, if possible, as to sustain their validity," the "streaming" terms should not be construed to run afoul of the written description requirement. *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999) (citing *Carman Indus., Inc. v. Wahl*, 724 F.2d 932, 937 n.5 (Fed. Cir. 1983)).

[50] '508 Patent at 5:40-45 [A-48].

[51] Nonend's Opening Brief (D.I. 39) at 10.

Indeed, Spotify's construction of "consumer node" (which closely mirrors that of Nonend's) requires that a consumer node *receive* as well as transmit content.[52]

Because Spotify's construction captures the true scope of the claim term, whereas Nonend seeks to impermissibly expand it, the Court should adopt Spotify's proposed construction.

### F.   "Central node"

| Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|
| A node that controls other nodes in a hierarchic system | A node that controls data transmission among other nodes in a hierarchic system |

The parties apparently agree that a "central node" exercises some degree of control over other nodes in a hierarchic system.  The only dispute with regard to this term is over the degree of control such a node has over other nodes.   Spotify relies on the language used by the patent applicants in the specification, which is the best evidence of what the term means.[53]  That direct intrinsic evidence trumps Nonend's gloss on a third party's patent that is referenced in the specification.

### G.   "Consumer node"

| Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|
| A peer node that is provided with software to receive content and to deliver it to other nodes requesting such, independent of the source | A node that is provided with software to receive content and to deliver it to other nodes requesting such, independent of the source |

As stated in Spotify's Opening Brief, the parties' only dispute with regard to the construction of "consumer node" involves whether, as Spotify presents, due to the overall context of the claimed inventions, and the many comments by the applicants disclaiming non-P2P hierarchic architectures, a consumer node is limited to a peer node, or whether, as Nonend urges, the Court should ignore all of the intrinsic evidence disclaiming non-P2P hierarchic architectures and define the term in a vacuum.[54]  As stated in Spotify's Opening Brief and in this

---

[52] The parties are in apparent agreement that a production node does not receive content when it is acting as a production node.

[53] *Phillips*, 415 F.3d at 1315 (internal citations omitted).  *See also* Spotify's Opening Brief (D.I. 40) at 16; '508 Patent at 1:36-39 [A-46], 5:56-58 [A-48].

[54] Spotify's Opening Brief (D.I. 40) at 17.

Responsive Brief, the alleged invention(s) of the Asserted Patents are limited to P2P technology.[55]  To adopt Nonend's proposed construction would allow Nonend to reach beyond what the applicants actually claimed and cover devices and systems the applicants actually disclaimed.  Indeed, Nonend's proposed construction could readily be read to cover a server in a hierarchical architecture as long as that server is "provided with software to receive content and to deliver it to other nodes requesting such, independent of the source."  This is contrary to the intrinsic evidence.[56]  Because Spotify's construction properly considers the totality of the intrinsic evidence, which compels one of ordinary skill in the art to conclude that the alleged inventions are directed to P2P networks, the Court should adopt Spotify's proposed construction.

**H.**  **"Peer-to-peer network"; "Peer system"; "Network"; "A system for distributing media content"; and "network of media players"**

| Term | Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|---|
| Peer-to-peer network | A network of peer nodes | No definition required – plain and ordinary meaning |
| Peer system | A peer-to-peer network | No definition required – plain and ordinary meaning |
| Network | A group of interconnected peer nodes | No definition required – plain and ordinary meaning |
| A system for distributing media content | A network of peer nodes used to transmit audio or video content | No definition required – plain and ordinary meaning |
| Network of media players | A group of interconnected peer nodes for connecting media players | No definition required – plain and ordinary meaning |

With regard to "peer-to-peer network"; "peer system"; "network"; "a system for distributing media content"; and "network of media players,  Nonend once again asks this Court to ignore the intrinsic evidence limiting the disclosed alleged invention(s) to P2P systems and architectures.  Although Spotify concedes that these terms do have ordinary meanings when used *outside* of the Asserted Patents, these terms take on additional meaning due to the applicants' surrender of subject matter to overcome prior art.

---

[55] *See, e.g., id.* at 3-7; section I.A., above.
[56] *Id.*

Nonend's insistence that the Court construe the terms in accordance with their plain and ordinary meaning transparently seeks an impermissible expansion of the claim scope. It is irrelevant whether the term "network" can take on a broader meaning outside the scope of the Asserted Patents. Because the patent applicants in the instant case disclaimed traditional hierarchic network architectures from the ambit of their alleged invention(s) in favor of P2P architectures, the term "network" as used in the asserted claims refers to P2P networks.[57] Adopting Nonend's construction would conflict with the intrinsic evidence and expand the claim scope to cover that which the applicants had previously disclaimed. Spotify's proposed constructions simply reinforce what the patent applicants understood their alleged invention(s) to be.

## I.     "Autonomously"

| Spotify's Proposed Construction | Nonend's Proposed Construction |
|---|---|
| On its own initiative and independent of other nodes | No definition required – plain and ordinary meaning |

Given the technical nature of networking technologies, a person of ordinary skill in the art would look to the intrinsic evidence to ascertain the patent applicants' definitions of certain claim terms.[58] With regard to the term "autonomously," Spotify did just that, and looked to the specification to see how the patent applicants used the term.[59] The patent applicants noted that for a peer node to act "autonomously," it would have to act "independent of [other nodes]," "on its own initiative," and "without intervention."[60] Nonend, on the other hand, again requests that the Court ignore the applicants' statements in favor of a vague and broad construction.

Furthermore, a review of dictionary definitions for "autonomous" or "autonomously" reveals that Spotify's proposed construction of the term, which is based upon the actual language

---

[57] Spotify's Opening Brief (D.I. 40) at 7 (explaining how Asserted Patents disclaimed non-P2P hierarchical systems and methods); '508 Patent at 2:10-12 [A-46], 2:22-30 [A-46].
[58] *Phillips*, 415 F.3d at 1315 (internal citations omitted).
[59] Spotify's Opening Brief (D.I. 40) at 19.
[60] *Id.*

of the specification, does not diverge significantly from common English usage.[61]  These

dictionary definitions show that an autonomous entity acts independently and without control by

others, just as Spotify proposes in its construction of the term.

**J.**     **"First communication channel" and "Second communication channel"**

| Term | Spotify's Proposed Construction | Nonend's Proposed Construction |
|------|-------------------------------|-------------------------------|
| First communication channel | A first connection via a transmission medium to a first peer node | A first connection via a transmission medium |
| Second communication channel | A second connection via a transmission medium to a second peer node | A second connection via a transmission medium |

Nonend criticizes Spotify's incorporation of "a first peer node" and a "second peer node"

into the proposed constructions for the "first communication channel" and second

communication channel" terms, respectively, for allegedly "reading in limitations not present in

the claim language."[62]  Nonend further criticizes Spotify's construction by pointing out that

"[t]he patentees intentionally sought broad coverage for their invention by not specifically

claiming the source or sources of the content received by the media player."[63]  And therein lies

the problem.

As Spotify has pointed out, the patent applicants had disclaimed non-P2P hierarchic

architectures in their bid to distinguish "the invention" or the "device according to the invention"

from the prior art.[64]  These repeated assertions by the applicants should properly limit the scope

---

[61] *See, e.g.*, Merriam-Webster' Collegiate Dictionary (11th ed., 2004) at 84 [A-4319]
("Undertaken or carried out without outside control; self-contained.  Responding, reacting, or
developing independently of the whole."); American Heritage College Dictionary (4th ed., 2002)
at 97 [A-4323] ("Not controlled by others or outside forces; independent.  Independent in mind
and judgment; self-directed."); Webster's New World Collegiate Dictionary (4th ed., 2000) at 96
[A-4327] ("Functioning independently without control by others.").
[62] Nonend's Opening Brief (D.I. 39) at 8-9.
[63] *Id.* at 9.
[64] Spotify's Opening Brief (D.I. 40) at 3-7; 19-20.

of the claims notwithstanding the fact that they did "not specifically claim[] the source or sources of the content received by the media player."[65]

Nonend's overbroad construction is an attempt to include infringement by systems the patent applicants explicitly disclaimed – non-P2P hierarchic systems – for example, by a server-based hierarchic system where two servers are connected to the claimed receiving media player via the communication channels.[66] This is impermissible in light of the patent applicants' disclaimers in the intrinsic evidence.

## II.   CONCLUSION

Because Spotify's claim constructions are supported by the case law and by the intrinsic evidence, Spotify respectfully requests that this Court adopt its proposed constructions for the disputed claim terms.

---

[65] Nonend's Opening Brief (D.I. 39) at 9; *see 800 Adept, Inc. v. Murex Securities, Ltd.*, 539 F.3d 1354, 1363 (Fed. Cir. 2008) (relying on statements in the specification and prosecution history to ascertain the order of steps of a method claim where such order was not apparent from the claim language); *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1143-1144 (Fed. Cir. 2005) (limiting "board" to wood cut from a log due to patentee's repeated statements regarding wooden boards; "Throughout the written description, Nystrom consistently used the term 'board' to describe wood decking material cut from a log."); *AquaTex Indus.*, 419 F.3d at 1382 (relying on the "teachings of the specification" to limit disputed claim term).

[66] There may be other limitations or arguments that would prevent such a claim read, but Spotify expects that Nonend would contest those as well.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Henry C. Bunsow
Craig Y. Allison
Alden K. Lee
Aaron R. Hand
BUNSOW, DE MORY, SMITH & ALLISON LLP
351 California Street
Suite 200
San Francisco, CA 94104
(415) 426-4747

Dated:  November 15, 2013
1130357

By: */s/ Philip A. Rovner*
  Philip A. Rovner (#3215)
  Jonathan A. Choa (#5319)
  Hercules Plaza
  P.O. Box 951
  Wilmington, DE  19899
  (302) 984-6000
  provner@potteranderson.com
  jchoa@potteranderson.com

*Attorneys for Defendants*
*Spotify USA Inc., Spotify Limited, Spotify*
*Technology S.A. and Spotify AB*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on November 15, 2013, the within document was

filed with the Clerk of the Court using CM/ECF which will send notification to the registered

attorneys of record that the document has been filed and is available for viewing and

downloading.

I further certify that on November 15, 2013, the within document was electronically

mailed to the following persons:

Stamatios Stamoulis, Esq.
Richard C. Weinblatt, Esq.
Stamoulis & Weinblatt LLC
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809
Stamoulis@swdelaw.com
Weinblatt@swdelaw.com

*Attorneys for Plaintiff*

Richard C. Vasquez, Esq.
Eric W. Benisek, Esq.
Jeffrey T. Lindgren, Esq.
Robert McArthur, Esq.
Stephen C. Steinberg, Esq.
Padraig O'Connor
Dee S. Gray
Vasquez Benisek & Lindgren LLP
3685 Mt. Diablo Boulevard
Suite 300
Lafayette, CA 94549
rvasquez@vbllaw.com
ebenisek@vbllaw.com
jlindgren@vbllaw.com
mcarthur@vbllaw.com
ssteinberg@vbllaw.com
poconnor@vbllaw.com
dgray@vbllaw.com

*Co-Counsel for Plaintiff*

*/s/ Philip A. Rovner*
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
provner@potteranderson.com