```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3                              -  -  -

 4    NONEND INVENTIONS N.V.,          )       Civil Action
                                       )
 5              Plaintiff,             )
                                       )
 6         v.                          )
                                       )
 7    SPOTIFY USA INC., et al.,        )
                                       )
 8              Defendants.            )       No. 12-1041-GMS

 9                              -  -  -

10                       Wilmington, Delaware
                         Thursday, March 20, 2014
11                            10:40 a.m.
                           Markman Hearing
12                              -  -  -

13
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
14
      APPEARANCES:
15

16              STAMATIOS STAMOULIS, ESQ.
                Stamoulis & Weinblatt LLC
17                      -and-
                ROBERT McARTHUR, ESQ., and
18              ERIC W. BENISEK, ESQ.
                Vasquez Benisek & Lindgren LLP
19              (Lafayette, CA)

20                              Counsel for Plaintiff

21              PHILIP A. ROVNER, ESQ.
                Potter Anderson & Corroon LLP
22                      -and-
                HENRY C. BUNSOW, ESQ., and
23              ALDEN K. LEE, ESQ.
                Bunsow, DeMory, Smith & Allison LLP
24              (San Francisco, CA)

25                              Counsel for Defendants
```

```
 1                   THE COURT:  Good morning.  Please, take your

 2     seats.

 3                   Counsel, how much time have we allotted for this

 4     hearing this morning today?

 5                   MR. BUNSOW:  Your Honor, Henry Bunsow for

 6     Spotify.

 7                   I don't believe there was a particular amount of

 8     time.

 9                   THE COURT:  How many terms are in dispute,

10     counsel?

11                   MR. BUNSOW:  There are 16 terms.  They fall into

12     five categories.

13                   THE COURT:  Is there any way to expedite this so

14     we don't have to spend an inordinate amount of time dealing

15     with what I consider to be more terms than we should have to

16     deal with?

17                   MR. BUNSOW:  As I say, Your Honor, they fall

18     into five categories, so it's not 16 individual terms.  From

19     my presentation, it really only covers about six different

20     categories.

21                   MR. McARTHUR:  That's correct, Your Honor.

22     That's how have we organized it.

23                   THE COURT:  How much time do you think we will

24     need this morning and perhaps part of the afternoon?  What

25     do you think?
```

```
 1            MR. McARTHUR:  Your Honor, for plaintiff Nonend,
 2   I think we can get through my presentation in about 30 to 35
 3   minutes.
 4            MR. BUNSOW:  Depending upon what he says, I
 5   believe that's about the same.  We ran through it this
 6   morning.  It was about 45.  I think I can cut it down.
 7            THE COURT:  I have to break at 12:30.  If we are
 8   not done, we will have to come back.
 9            Why don't we start with introductions, please.
10            MR. STAMOULIS:  Your Honor, Stam Stamoulis on
11   behalf of Nonend.  With me is Eric Benisek and Rob McArthur.
12            THE COURT:  Going morning.
13            Mr. Rovner.
14            MR. ROVNER:  Good morning, Your Honor.  Phil
15   Rovner, from Potter Anderson, for defendant Spotify.
16            With me is Henry Bunsow and Alden Lee from
17   Bunson DeMory.  And Mark Silverstein from Spotify is here as
18   well.
19            THE COURT:  Good morning.
20            (Counsel respond "Good morning.")
21            THE COURT:  Counsel, in your discussions, do you
22   want to do term by term?
23            MR. BUNSOW:  We discussed going through the
24   whole thing.  We thought it would be faster.
25            THE COURT:  You will get the last word.
```

```
 1                    Let's go.

 2                    MR. McARTHUR:  Thank you, Your Honor.

 3                    Your Honor, may I approach?

 4                    THE COURT:  We need two of those.

 5                    MR. McARTHUR:  Good morning, Your Honor.

 6                    Robert McArthur from Vasquez Benisek & Lindgren.

 7     With me is Eric Benisek.  Your Honor, if you have no initial

 8     questions for me...

 9                    THE COURT:  I don't have any questions.  I

10     prefer you get right into the presentation.

11                    MR. McARTHUR:  I would like to briefly describe

12     the area of technology of the patents in suit.  Then we will

13     get to the claim terms in dispute.

14                    There are six patents in dispute.  They all

15     relate to the distribution of data.  While they all relate

16     to this area, each of them is directed to specific

17     embodiments that are set forth in the specification.

18                    Here we see the titles of the six patents.  And

19     they are instructive.

20                    For example, the '508 patent deals with multiple

21     source receiver-driven streaming of content between peers.

22     This one patent in particular deals with peers.  The rest of

23     the patents don't mention peers at all.  For example, the

24     '138 patent is directed to streaming of content between

25     media players while searching for other media players in a
```

1    distribution network.

2              Likewise, the '513 and '315 patents represent

3    claims that are directed to streaming content from one or

4    more specifics nodes as described in the specification.

5              I would like to set the table a little bit for

6    distribution of data background in the context of the claims

7    and terms.

8              As I mentioned, the patent is generally directed

9    to distribution of data.  In particular, the patent makes

10   reference to traditional client/server architecture, whether

11   it's client to server and server to client.  In addition,

12   the patent also discusses peer-to-peer and client-to-client

13   networks.  Lastly, the patent specification contemplates a

14   combination of two different types of networks, where there

15   are elements of both client/server and peer-to-peer, or what

16   we will term "hybrid" today.  The patent refers to this in

17   terms of nodes.

18             Looking at Figure 2A of the patent, you see a

19   representation of the type of hybrid network I just

20   discussed and the constituent parts.  The top of the figure

21   is the production node.  This node is responsible for

22   transmitting content to other nodes in the network.  In

23   particular, the specification notes that the content is

24   either generated or present in the production node itself,

25   then sent to other nodes in the network.

1          Below the production nodes are a plurality of

2    consumer nodes.  Here two consumer nodes are connected to

3    the production node to receive content when they request

4    such.  Consumer nodes are also in turn connected to

5    additional consumer nodes, and so on and so forth in the

6    network.  The production node can stream content from the

7    part itself to the consumer nodes.  And they are in turn

8    connected to additional nodes.  Here you can see consumer

9    nodes 2 and 2' receiving content from the production node.

10         Those two consumer nodes can then in turn stream

11   content to additional consumer nodes, 3 and 3', as shown in

12   the figure.

13         And again, so on and so forth, it can stream the

14   content to consumer node 4 as shown.

15         One of the notable aspects of the patent is the

16   consumer nodes themselves can be sources of content to other

17   consumer nodes in the network.  They can establish and test

18   connections between each other for the transmission of

19   content.

20         You can see consumer node 2, testing connection

21   with consumer node 2', then requesting and receiving content

22   back.

23         The consumer node can also test and establish

24   content with the production node and with other consumer

25   nodes at the same time, when they prefer better connection

1        to request and receive this content.

2                Finally, the patent also discloses the node, in

3        this case consumer node 2', can stream content to multiple

4        nodes, likewise, and it can also receive content from

5        multiple nodes as shown here.

6                Now, Figure 2A discloses an example of the

7        hybrid network I was talking about.  This is illustrative of

8        that.  At the top, the production node streams content to

9        the consumer nodes and is illustrative of a client/server

10       type of architecture.

11               Below you have the peer-to-peer client type.

12       And among that there is the whole hybrid type of network

13       that we discussed.

14               Spotify argues, in order to disclaim this

15       patent, that of the disputed network, all of this patent

16       that is left is peer to peer, Perhaps they are arguing that

17       the patent is not entitled to the full scope of the claims

18       to which it deserves.  In light of this purported disclaimer

19       argument, in order to inject into most of the claim terms

20       today the term peer, to attempt to limit the scope of the

21       claim just to peer-to-peer, this is a classic defense

22       tactic, reading the specification narrowly, reading the

23       claims narrowly, in an attempt to limit them to less than

24       the patentee is entitled.

25               But the standard is extremely high for this.

1    There must be shown an intent to deviate from the ordinary

2    and customary meaning of a claim term by including in the

3    specification expressions of manifest exclusion or

4    restriction, representing a clear disavowal of claim scope.

5    It is the clear disavowal of that claim scope that is

6    important, Your Honor.

7                We are confident, when you look at the

8    specification, you will find there is no disclaimer for that

9    argument.

10                Before you get to the fault in the argument, I

11   would like to highlight the evidence that shows that hybrid

12   networks are included in the specification.

13                They are in the title, the abstract.  They are

14   in the claims.  They are also taught in the specification.

15                Again, we have the titles.  Here, the '508

16   patent deals with peers.  The rest of them do not.

17                Looking at the abstract, again, the '508 patent,

18   the title includes peers.  The abstract includes a

19   peer-to-peer network environment for the claims.  "Peer" all

20   over the place, Your Honor.

21                When you look at the other abstracts, the '752,

22   no peer.  This patent is concerned with distributing content

23   among media players, not peers.

24                The '138 patent, again, media players, not in

25   the peer-to-peer network.

1                       '862, the same.  The '513.  Now we are talking

2        about production nodes or media player systems and not

3        peer-to-peer systems, as well as the '513 patent.

4                       The word "peer" never appears in these

5        abstracts, with the exception of the '508.

6                       Spotify would ask you to implicitly read the

7        word peer in.  I respectfully submit that implicitly reading

8        the word peer in is not an explicit disclaimer of a hybrid

9        system.  You have to read the word in.  That is not a clear

10       disavowal.

11                      Looking at the specification itself, it actually

12       teaches this hybrid system.  Here in Column 6, it says,

13       In the device according to the invention each consumer node

14       with a certain overcapacity will be able to contribute to

15       the increase of the total distribution capacity of the

16       network when added to this network.

17                      Here, the network becomes larger and the more

18       nodes are added, the more capacity will be available and the

19       quicker the network potentially may become, without

20       expansion of the capacity of the server that is in that

21       network.

22                      It specifically contemplates nodes being added

23       to the network of a server.  It is a hybrid network, Your

24       Honor.  And it uses the language, "In the device according

25       to the invention each consumer node with a certain

1    overcapacity."

2              Looking at the claims, all of the claims of the

3    '508 patent are directed to peer-to-peer networks.  That is

4    the networking environment.  There are only two patents that

5    use the word peer in the dependent claims.

6              Looking closer at the '508 patent, we see, the

7    preamble states a peer-to-peer network environment.  It

8    calls for, specifically calls for a receiver peer node and

9    transmitter peer nodes.

10             So there is no dispute that this patent is

11   directed to peer to peer, but it is not the only patent.

12             When you looking at the dependent claims of the

13   '138 patents, here Claim 7 is set forth, further modifying

14   the media player system of Claim 1 as peer systems.  This

15   suggests that the media player systems of Claim 1 are

16   broader than peer systems under the doctrine of claim

17   differentiation.

18             In fact, in the '513 patent, we have the same

19   situation.  Again, media player systems are modified to be

20   peer systems in the dependent claim.  This is the only

21   meaningful difference between Claim 40 and Claim 33, further

22   strengthening the presumption that they are different in

23   scope than the media player system in the Dependent Claim 33

24   and the Dependent Claim 40 are not limited to peer systems.

25             So to summarize, the title, the abstract, the

1    specification, the claims, all suggest broader scope than

2    Spotify argues for its disclaimer.

3              Let's take a look at what Spotify needs to

4    establish from the evidence they showed in supporting the

5    establishment of disclaimer.

6              The specification here.  They point first to

7    three areas.  First, they say the abstract.  Then they say

8    there is invention language that disclaims all the

9    peer-to-peer.  Then they point to prior art statements that

10   disclaim all but peer-to-peer.

11             We have looked at the abstracts, all but the

12   '508.  The '508 explicitly expresses peer-to-peer.  The rest

13   of them, Spotify argues, implicitly express peer-to-peer.

14   That is not the standard.  You need clear disavowal to

15   support the disclaimer.

16             Let's look at the invention language.

17             Spotify says that the use of the invention

18   language in the summary of the invention and other parts of

19   the specification limits the scope of the claims.  The

20   standard here is the invention language, to do that, must

21   describe the invention as a whole and not just be limited to

22   an embodiment, and must do so clearly.  Spotify cannot meet

23   either requirement.

24             Let's take a look at a couple of the examples of

25   the invention language that they have.

1      The first one, "It is an object of the invention

2  to at least partially remove the drawbacks mentioned

3  explicitly or implicitly in the prior art."

4      Now, this is not a disclaimer.  It's not even a

5  disclaimer on its face.  It says "at least partially remove

6  the drawbacks."  That is not a clear disclaimer.

7      The prior art here is referring to hierarchical,

8  multitasking, multi-gauging systems.  This is not clear, the

9  clear, complete, categorically rejection of hierarchical.

10      The second statement, "Additionally, it is

11  possible to build up a data network without hierarchy."

12      It is in addition.  In addition to what?  In

13  addition to a network with hierarchy.  This is describing an

14  embodiment, Your Honor, and not the invention as a whole.

15      Similarly, the second statement, "The invention

16  moreover relates to a method."

17      Again, moreover.  It is in addition to what else

18  is described in the specification than merely an embodiment.

19      Lastly, "In an organic data network where

20  various types of nodes can be distinguished."

21      These are various types of nodes that are set

22  forth in the specification.  They are not peer nodes,

23  production nodes, consumer nodes.  Again, it is dealing with

24  an embodiment.  It is not clear that it is limited just to

25  hierarchical systems.

1                    Now, if you look at this language, what jumps

2      out is what's not there.  "Peer."  Nothing says limited to

3      peer.  Nothing says the invention must be peer.

4                    If you look at the case law that Spotify cites

5      for this proposition, the Dining Law case, all over the

6      specification, the invention must be peer to peer.  The

7      Microsoft case, it says 12 times that the invention must use

8      telephone lines.

9                    The Bard case, the plug must have pleats.  It

10     says that in the specification explicitly.

11                   That is not the case in our specification.  It

12     never says the invention must be peer-to-peer.

13                   This lack of clarity is particularly acute when

14     you look at the specification describing an invention

15     embodiment that teaches both server and nodes together.

16                   I would like to point out, in this one, it also

17     uses the device according to the invention language.

18                   The third section of argument is distinguishing

19     the prior art.  Now, in this area, Spotify makes much hay

20     about the specification's discussion of the prior art and

21     how the claimed inventions are different.  It fails to state

22     the standard under which these supposed disclaimers must be

23     viewed:  Mere criticism or disparagement of the prior art is

24     not enough.  An unambiguous and clear disclaimer is

25     required.

1                    First, Spotify argues that the specification's

2      treatment of multi-agent and multi-cast prior art is

3      disfavored because they rely on overhead structures.  Now,

4      it is true, the specification points out the disadvantages

5      with this prior art, and indeed goes on to state that it is

6      an object of the invention to at least partially remove some

7      of these disadvantages, but "at least partially remove,"

8      not fully remove or fully disclaim the hierarchy that is

9      shown in the prior art.

10                   Such disparity with multi-cast and multi-agent

11     prior art does not rise to the level of disclaimer required

12     by the Federal Circuit in such cases as Epistar versus ITC,

13     which is cited in our papers.

14                   Secondly, Spotify relies heavily on this

15     statement.  "For that matter, numerous applications of

16     so-called peer-to-peer networks that may or may not have

17     client/server technology are known.  However, an organic

18     network having a dynamic topology wherein data transfer

19     between server and client takes place like in the device

20     according to the invention, is not described in them."

21                   What is this statement saying?  Spotify

22     interprets this as a complete and unequivocal disclaimer of

23     any of type of hierarchy.  But there is a much more simple

24     and straightforward interpretation.  The first part of the

25     sentence, "For that matter numerous applications of

1    so-called peer-to-peer networks that may or may not have

2    client/server technology" in them, that is the prior art.

3    Here is the prior art.  Here is what is known.  Then they

4    say, here is our invention over here, and we don't describe

5    the prior art.  We are different.  We are novel.  We are not

6    obvious.

7              That is what this is saying, Your Honor.  It is

8    not a disclaimer of anything with hierarchy.  It is a

9    statement that this is new and not before described in the

10   art.

11             Of course, the patentee is going to say this.

12   Moreover, if there are multiple interpretations of a

13   statement in the specification, clear disavowal cannot be

14   shown because it is ambiguous.  That is the Golight versus

15   Wal-Mart case, Your Honor, 355 F.3d, 1328.

16             Finally, taking Spotify's argument to the

17   extreme, here it states that prior art is peer-to-peer

18   networks.  It may or nay not.  If that is a disclaimer, it

19   is a disclaimer of peer-to-peer networks as well.  And that

20   is just not what is described in the patents.

21             To summarize, statements criticizing the prior

22   art do not rise to the level of disclaimer, and statements

23   effectively declaring the invention novel and nonobvious are

24   not as well.

25             Now, here are the claim terms that are affected

1    by the disclaimer argument, the network terms and the system

2    terms.   These are terms, network and system terms, that are

3    obvious to one of ordinary skill in the art.   Nonend's

4    position is they don't need construction.   They don't call

5    for peer, with the exception of peer-to-peer network, the

6    peer system terms.   That is a term that one of skill in the

7    art would readily understand.

8              The other terms have a little more to them.   I

9    will get to them.   They also suffer from the disclaimer

10   argument, according to Spotify.

11             I would like to turn now to what doesn't have a

12   peer term in it, streaming terms.   Here we have the parties'

13   competing constructions.

14             Essentially, the dispute breaks down on three

15   lines.   First, whether data packages or content were prior

16   to distributing.

17             Second, whether streaming transmissions,

18   continuous and sequential, whether that is not required.

19             And third, whether the transmission must be

20   played or may be played.

21             Looking at the first term, the first issue

22   there, whether it is a data package or content.   Now, the

23   specification admittedly discusses both.   It discusses

24   content and it discusses data packages.   But it does note

25   that content is generally divided into data packages, but

1     not always.

2                 The claims are broader.

3                 Most of the claims talk about content and not

4     data packages.  We submit that content is a better

5     construction than data packages.

6                 Now, turning to the next issue, continuous and

7     sequential transmission.

8                 To be sure, the specification talks about the

9     content of streaming applications and its preference to be

10    sequential and its preference to be continuous.  Of course.

11    Because when one is watching streaming content, we don't

12    want to start with documents already started and we don't

13    want things out of order.  But the claims don't claim this

14    limitation.  This is a preferred embodiment that should not

15    be imported into the claims.

16                It is possible to receive streaming content out

17    of order.  In fact, the specification discusses streaming

18    from two different sources at different bandwidths.  Under

19    that type of situation, it is possible to receive the

20    content out of order.

21                Secondly, it is possible that they are

22    noncontinuous.  Indeed, the specification talks about

23    changing sources, stopping and receiving from one source and

24    continuing and receiving from another.  In that situation,

25    there would be a break in the continuity of the

1    transmission.

2            But the claims don't say they must be sequential

3    and they must be continued.

4            Lastly, transmission is generally affected by

5    network conditions.  The streaming nature of the content

6    doesn't change if the network gets overloaded and pauses for

7    a few minutes and the transmission breaks and then restarts.

8            So I submit that while preferred for the

9    listener or the viewer, the streaming does not need to be

10   continuous or sequential to be streaming.

11           Now turning to the remaining dispute regarding

12   whether it must be played back or should be played back.

13   Here, we have the competing constructions again.  For

14   Nonend, transmission of content may be played back while the

15   transmission is occurring.

16           Spotify says it must be played back while the

17   transmission is occurring, or it says played back by the

18   receiver.

19           The argument here, Spotify says the permissive

20   language of "may be played back" captures the prior art,

21   captures downloading.  The prior art, as set forth in the

22   prosecution history, is you have to download the whole file

23   before you can play it back.  That is the Henzlinger

24   reference that is mentioned in the papers.

25           Spotify's construction does not capture that.

1    In fact, it says there, it may be played back while the
2    transmission is occurring.  That cannot happen in the prior
3    art.  Nonend's claims do not reach the prior art in that
4    regard.
5              Streaming specifically allows it to be played
6    back while the transmission is occurring but not
7    necessarily.  If you start listening to a song that streams
8    in your computer and you press "pause" because you want to
9    listen to something else or talk to somebody else and come
10   back and listen, the streaming nature doesn't change.  It
11   still comes into your computer in a streaming fashion.  It
12   is just you are not listening to it right now.  It does not
13   capture the prior art.
14             Turning to competing terms "peer node" and
15   "device" terms.  These are terms that are very similar,
16   because Spotify asserts that a device is a peer node.  So I
17   will talk about them together.
18             With respect to peer node, peer is a common
19   term.  It is well understood by one of skill in the art.
20   The specification indeed says that peer-to-peer systems were
21   known at the time of the filing of the application in 2001.
22   This is a term that does not need construction.  In fact,
23   looking at Spotify's construction, it is 37 words.  It is
24   functional language about transmitters and receivers.  This
25   language is already found in the claim language itself and

1          doesn't need to modify peer node in its own construction.

2                    The '508 patents talks about receiver peer nodes

3          and transmitter peer nodes.  That construction does not need

4          to be included in what a peer node is.  It is already found

5          in the functional language of the claim.

6                    Secondly, Spotify injects the concepts of server

7          and client into their construction, which are contrary to

8          peer, certainly confuse the construction.

9                    Peers can be equal ranking in a network but have

10         different functions.  Spotify requires that they have these

11         two functions and that they change that construction on

12         their landscape.  That is not found in the claims of the

13         '508 patent.

14                    Looking at the device, again, "device" is a

15         common term, commonly understood English word, that does not

16         need construction.  It is also known to one of skill in the

17         art, and it is very context-dependent.  Spotify asserts that

18         this must be a peer node according to the patent.  But that

19         is not how the claims and the specification are described.

20         It is used generally throughout the specification.

21                    It can refer to communication equipment, media

22         players, mobile communication equipment.  This evidences

23         that it was meant to be used in its common parlance.  A

24         piece of equipment.

25                    Indeed, Spotify points to the reasons for

1    allowance submitted by the examiner that said peer node is a

2    device.  Well, in that same paper, he also said

3    computer-readable medium is a device.  And that's evidence

4    that he uses that term in its ordinary usage, a piece of

5    equipment.  Depending on what context is used, it takes on

6    different constructions.

7                Turning now to production node.  There are two

8    issues that are essential to this dispute.  The first is the

9    injection of peer node into production node in Spotify's

10   construction.  I think we have dealt with that with the

11   disclaimer argument.

12                The second is that while both parties agree that

13   the specification teaches production node that transmits

14   content to nodes in the network when they request such,

15   Spotify stops.  It doesn't the take full teaching of the

16   specification.  The specification teaches more.  It says

17   that the production node can adapt, add, and generate its

18   own content.  Spotify cites this passage in its papers, but

19   ignores it in its construction.

20                From this teaching, and the flow of content in

21   the network, plaintiff suggests that this captures the

22   notion that production node introduces content into the

23   network, new content, adapted content, generated content,

24   such that it provides, initially provides content into the

25   network that can then be distributed to consumer nodes and

1    so on and so forth throughout the content.

2            Moreover, the specification mentions that

3    consumer nodes who add and adapt content can become

4    production nodes as well, further reinforcing that it is new

5    content that is provided to the network by the production.

6            I want to briefly touch on consumer node.

7    Although the only dispute here is it is a peer, it is

8    closely related to these nodal discussions that we are

9    having.

10           The only dispute here is whether Nonend

11   disclaimed they are all but peer-to-peer nodes, and consumer

12   node must be a peer.  Consumer node is a consumer node.  The

13   patentee's own words.  It uses "peer node," it uses

14   "consumer peer node."  Not "consumer node."  We should take

15   the patentee at his word.

16           The text term, communication channel.  Now, the

17   parties agree that these are transmission media and that

18   there are two of them.  In keeping with the theme, Spotify

19   injects peer.  It says the first communication channel must

20   be connected to a first peer and the second communication

21   must be connected to a second peer.

22           But that is not the claim language.

23           If you look specifically at the claim language

24   in the '862 patent, you see that it says, the only thing

25   that the communication is operationally coupled to is the

1    receiving media player.  It doesn't specify what is on the

2    other end, leaving open-ended comprising language.

3              The patentee chose to leave that open.

4              Spotify would have the Court rewrite this claim

5    to add connected to a first peer and connected to a second

6    peer.  The claim as a whole is broader, and the peer

7    limitation should not be limited.

8              Moreover, the specification instructs that two

9    different types of communication channels can be connected

10   to the same source.  In Figure 5, there is a figure that

11   shows a source connected to the receiving media player for

12   two transmissions.

13             The specification also contemplates different

14   transmission media, cables and Wi-Fi.  It is certainly

15   within the scope of the claims that a receiving media player

16   can be connected to a single source of content through both

17   an Ethernet cable and Wi-Fi at the same time.

18             Looking at the term "autonomously" next, again,

19   Your Honor, we say this is a common English word that

20   doesn't need definition.  One of skill in the art would know

21   what autonomous means, especially in the terms of nodes in a

22   distribution network.

23             Taking one readily understandable word and

24   substituting nine words into it just confuses the matter.

25             There are two issues here.

1          First, Spotify's construction is on its own

2    initiative.  That could describe autonomously, but it is

3    just substituting one set of words for another.  It doesn't

4    advance the ball.

5          Secondly, "independent of other nodes," this is

6    where the confusion lies, Your Honor.  The claim language

7    suggests that the nodes make autonomous decisions,

8    specifically search autonomously or determine autonomously.

9    It doesn't say they must do it completely independent of

10   other nodes.

11         Now, the specification in this regard notes that

12   the consumer node is able to act entirely autonomously and

13   independently of other nodes.  It suggests that autonomous

14   and independent have different connotations within the

15   specification.  The decision to make the assertion that

16   determining is done autonomously and the node may achieve

17   this functionality does not have to achieve its

18   functionality by itself.  It can make the decision to, and

19   then use other nodes in the system to do that.

20         "Independent of other nodes" would cause

21   confusion.

22         The last term here, Your Honor, is central node.

23   What is interesting about central node is it is a negative

24   term.  It is found in a dependent claim.  The parties agree

25   that a central node is a node that controls other nodes in a

1    hierarchic system.  They disagree as to the scope of that

2    control.

3              Spotify would have, I assume, all control.  But

4    the specification is a little bit more specific.  According

5    to the patent, Patent 5,511,168, which specifically deals

6    and teaches the control of data transmissions among nodes in

7    virtual configuration circuits, it does not teach total

8    control.

9              Nonend's construction come closest to capturing

10   that.  Spotify's construction is not precise.

11             Now, this is a dependent claim.  And the

12   dependent claim says no node in the network is a central

13   node, which suggests that the independent claim from which

14   it depends could have nodes in the network that are central

15   nodes.  This again cuts against Spotify's disclaimer

16   argument of hierarchy.

17             With that, Your Honor, hopefully I have saved

18   enough time for myself.

19             THE COURT:  Yes, you have.

20             Counsel.

21             MR. BUNSOW:  Thank you, Your Honor.  May I

22   approach?

23             THE COURT:  Yes.

24             MR. BUNSOW:  So I have handed up two sets of

25   binders, Your Honor.

1               My name is Henry Bunsow.  I am with the Bunsow

2    DeMory firm.  And I represent Spotify.  I have handed up two

3    sets of binders.  The first is a copy of the slides I am

4    going to go through.  I might not go through all of them.  I

5    am going to try to pick and choose as we go through.  But I

6    will cover most of them.

7               The second is an amendment that was filed in

8    what became the '531 patent.  That's a continuation patent,

9    which means that there was no changes in the specification

10   from the parent applications.

11              This amendment was filed ten years, ten years

12   after the initial parent application was filed, the Dutch

13   application.  And ten years later, what they did with this

14   invention I think is telling.  And I am going to address

15   that about halfway through the presentation.

16              So I would like to start out by talking about

17   peer-to-peer networks and then briefly on the asserted

18   patents.  Then we will move right into the disputed claim

19   terms and why we think that the definitions we propose are

20   true to the intrinsic record in this case, the

21   specification, and the file history, and the Nonend

22   proposals simply invite vagaries that we think the jury will

23   struggle with, and that we think will result, could

24   potentially result in an unfair, unjust, and wrong result in

25   this case.

1                Peer-to-peer networks.  There are different

2    types of networks.  The networks that you and I are most

3    commonly familiar with are the ones that we use every day,

4    the network here in the courthouse, for example.  And that's

5    what's called a hierarchical network.  There is a server, no

6    doubt, here in the building, your computer is connected to

7    that server, and you talk back and forth with that server

8    and get information.

9                That's classic architecture.  And that is what

10    this patent is not about.  Very clearly, not about that.

11    For one reason, it existed 20 or 30 years before 2001, when

12    this original application was filed.  So it can't be that.

13    We know that.

14                Another type of network is peer-to-peer

15    networks.  Peer-to-peer networks became popular in the

16    mid-1990s.  And basically, that's sort of daisy-chaining

17    computers together.  I will show you an example of that and

18    how it works.  For example, if we are both on the Internet,

19    your computer might talk to my computer.  I can send

20    information to you.  You can send information to me.  We

21    would both be peers on this organic network.

22                And organic is the keyword here.  It is in all

23    the patents.  Organic means that it grows.  It gets big.  It

24    gets small.  It changes.  The patents refer to it as an

25    organic and dynamic network.

1           That is exactly the opposite of a hierarchical

2      network.

3           Your computer is connected to the server all the

4      time.  It doesn't change.  The peer-to-peer network is an

5      organic, dynamic network, as the patents describe, is one in

6      which the computers join, they talk for a while, they leave,

7      they come back together again.  And I have got an

8      illustration of that.

9           You heard a lot this morning about something

10     called a hybrid network, which is, Nonend says, a

11     combination of a hierarchical network with a server and

12     adding some peer networks in addition to that.  That is an

13     attempt to cover, obviously, some of the technology that we

14     are using.

15          Interestingly, you will not find the word hybrid

16     in any of these patents or in the file history.  It's just

17     not there.

18          And I will show you this morning that the

19     inventor, when he filed his application in 2001,

20     specifically said that that was not what he was talking

21     about.  He was talking about an organic, dynamic network,

22     where computers come and go and change.  And you cannot have

23     any hierarchical compliment in that network.  As simple as

24     that.

25          So here is the typical server/client network

1    that you are familiar with and I am familiar with.  You log

2    on in the morning.  You address the server.  The server

3    sends you your e-mails.  If you want to see Court files from

4    cases, you request it.  The server sends it back.  You might

5    be on the network.  Judge Robinson could be on the network.

6    Other computers are on the network.

7              This is a typical hierarchical network, was

8    known for decades before the original application was filed.

9    There is no dispute that this is not what these patents are

10   supposed to be about.

11             A peer-to-peer network is totally different.  In

12   a peer-to-peer network a user logs on, and communicates with

13   somebody, typically over the Internet, who is also logged

14   on.  But that user can log off.  This is what the organic,

15   dynamic feature of a peer-to-peer network is all about.

16             As you can see, as more computers log on, they

17   talk to each other.  They might exchange music files.  They

18   might exchange video files.  They can exchange data.  But

19   when the users log off, they leave.  That is the dynamic

20   capability.

21             And all of these patents describe an organic, in

22   other words, it grows on itself, an organic, dynamic

23   topology they call it.  That is what is being shown here and

24   that is what these inventions are about.  That's what these

25   patents are about.  That's what they clearly say in the

1    specification.  That's what they told the Patent Office when

2    they were getting these patents.  And that's what they

3    should be limited to.  And that's all we are asking the

4    Court to do.

5              So there are six patents.  They issued at

6    various times, with the latest ones issuing in 2012.  They

7    all claim priority, however, to a single Dutch patent

8    application filed on February 16, 2001.  And that Dutch

9    patent application, I won't read the title in Dutch, but the

10   translation is Organic Data Network with a Dynamic Topology.

11   That's the parent.  That's where all these rights come from.

12   And that's what this invention is, exactly what I just

13   explained, an organic data network with a dynamic topology.

14   That is not a server/client network, such as you use and I

15   use.

16             The '508 patent is the earliest to issue in a

17   series of patents before the Court.  It talks about being a

18   multiple-source receiver-driven streaming of content between

19   peers.

20             That's exactly what I described.  Exactly what

21   we are talking about.  But the other ones, even though they

22   use different language, is really saying the same thing,

23   because you cannot run away from the original specification

24   that was filed in 2001, although, as I will show you, they

25   tried.

1            But, let's look at the others.  Playing media

2       content on a media player while streaming the retrieved

3       parts of the media content to other devices.

4            That is a peer-to-peer network.  Other devices,

5       streaming, contents.

6            Same with the others.  If you look at the

7       titles -- you know, I am not going to rely on the titles.  I

8       am going to cut through here fairly quickly to get more to

9       the meat of the discussion.

10           So of the six patents that are in dispute, the

11      '508 patent has the most claims being asserted.  And that's

12      14 claims.  The '508 patent is also the representative

13      specification that the parties have been using in this case.

14      There are a total of 49 claims across these six patents.

15      And I believe that the specification and the file history is

16      clear that they relate solely to peer-to-peer organic,

17      dynamic networks.

18           They do not cover all peer-to-peer systems.  In

19      fact, they talk in Column 2, which is the section --

20      whenever you see Column 2, that's the invention, description

21      of the invention section of the patent.  So the description

22      of the invention section, of course, is a critical part of

23      the application.  The case law says that you really look to

24      that to see what the environment of the invention is to see

25      what the inventor is talking about.

1           It says, "Numerous applications of so-called

2    peer-to-peer networks that may or may not have client/server

3    technology are known."

4           So we now know there is nothing unique here

5    about just peer-to-peer, particularly, and nothing unique

6    about combining client/server technology, the so-called

7    hybrid network that he is talking about.

8           So the inventions have to be something else.

9           The asserted patents do not cover a hierarchical

10   client/server network.  That is clearly set forth.  They

11   disclaimed a hierarchical client/server network.

12          They repeatedly described the invention as an

13   organic network.  This is how they distinguish peer-to-peer:

14   because it's an organic network where the peers come and go.

15          So the advance here was not a client/server

16   network.  That was known for decades.  It wasn't just a

17   peer-to-peer network having some client/server capability,

18   the hybrid that he described.  It wasn't that.  What was it?

19   It was this organic, dynamic network where it was arranged

20   so that computers could join the network, leave the network,

21   the animation that I showed you where they come and they go,

22   and the network grows and shrinks .  That's what this

23   invention is all about.  That's what these patents are all

24   about.

25          On Column 2 in this last quote, I think this

```
1    is -- there are many of these quotes.  But Column 2 again

2    describing the invention, "By choosing such a device an

3    organic data network can be built up or created in which

4    independent devices according to the invention are able to

5    provide other independent devices according to the invention

6    with data so that, for instance, data that are available to

7    a network are clearly accessible to any given devices in a

8    network."

9

10             THE COURT:  I think you misspoke.  I think you

11   said "clearly."

12             MR. BUNSOW:  I apologize, Your Honor.  Network

13   are quickly accessible."

14             What we are talking about here is computers

15   joining with data that can be accessed back and forth.  And

16   we are going to learn in a couple of minutes that these

17   devices are the nodes.  The nodes can either provide data or

18   receive data.  So there are multi-function nodes in this

19   organic, dynamic network.  They are not a client purely.

20   They are not a server purely.  It clearly says that the

21   production node can be a consumer node, at one time

22   providing data and at another time receiving data.

23             And, in fact, it distinguishes other types of

24   networks, such as the one that Nonend is asking you to

25   include in the claims of this patent.
```

1              "In conformity with the device according to the

2       invention it is namely possible that the same peer at one

3       moment acts as a server having a second peer as a client and

4       at another moment acts as a client of the second peer now

5       acting as a server, without a control being at the basis

6       therefor."

7              So this is the description of the invention in

8       Column 2.  And what we are being told is that this invention

9       eliminates the need for a dedicated server.  That is the

10      whole point here.

11             These peer nodes can provide information.  They

12      can receive information.  That's what this invention is

13      about.

14             The inventor is properly distinguishing the

15      prior art here and saying that I don't need a dedicated

16      server.  I don't need to spend all the money for a big

17      cabinet and a server room and a server and all that sort of

18      thing.  I am going to do that by a piece of software,

19      basically, that turns your computer into both a server and a

20      receiver, my computer into a server and a receiver, and we

21      talk to each other.

22             That's what the invention is.  And any attempt

23      to add a hierarchical server/client dedicated connection is

24      the antithesis of what the inventors said this invention

25      was.

1           The patent applications repeatedly describe the

2    invention as an organic network.  Central in the network are

3    consumer nodes with a growing number of consumer nodes the

4    data network has created.

5           And that's clear for every one of the six

6    patents.

7           When it is talking about the object of the

8    invention, it even goes further.  "The invention provides a

9    device for either generating or maintaining an organic data

10   network having a dynamic topology."

11          And it continuously goes over it and over it not

12   only in the background of the invention but the description

13   of the invention.  I am going to clip through these.  I

14   would commend them to the Court's reading.  I don't think

15   there is any purpose served in my just reading it to you.

16   But needless to say, there are numerous examples of what I

17   am talking about here.

18          The law says that when a patent thus describes

19   the features of the present invention as a whole, this

20   description limits the scope of the invention.

21          Basically, the public is entitled to take the

22   applicants of the asserted patents at their word.

23          Now, there are also a lot of invalidity issues,

24   such as written description and enablement and that sort of

25   thing that we are not going to talk about today.  But

1    fundamentally, for the purposes of Markman, what I would

2    commend to the Court is just a straight-up reading of the

3    specification of the '508 patent and what it says the

4    invention is.  And it doesn't say it once.  It says it more

5    than nine times.  This is not just an offhand comment.

6         The primary embodiment discloses a peer-to-peer

7    network.  If that was the only place it was disclosed, they

8    might have an argument.  But the primary embodiment, the

9    other embodiments, are perfectly consistent with what the

10   inventor in the '508 patent called his invention.

11        Figure 6A and 6K show exactly how this works.

12        If we look at Figure 6, one thing that you will

13   notice missing -- by the way, these circles are all

14   computers -- one thing you will notice is missing is any

15   kind of server.  There is no server there.  What we have is

16   No. 120 over on the left-hand side here.  That's what they

17   call the production node.  Remember, a production node can

18   be a consumer node.  It switches back and forth, depending

19   on whether it is transmitting or receiving.  This is how

20   they tell you that the system works.  So there is some data

21   on 120, and he sends some of it to 123 down here.  There is

22   the connection.  123 turns out is connected to 125 and 127.

23        So the data begins to be propagated through the

24   network.  Other connections are made through other

25   computers.  And ultimately everybody in the peer network

1    gets the data that was promulgated throughout the network.

2              No server required.  No hierarchical network.

3              That's the invention of these patents.  And

4    that's the way that the claims need to be interpreted.

5              As I say, I don't believe there is a dispute

6    that pure hierarchical networks are outside the patent.  We

7    believe any type of hierarchical network is outside.

8              In Column 2, the inventor was very clear, quote,

9    "It is possible to build up a data network without

10   hierarchy, in contrast to the classic networks in the

11   Internet."

12             Of course, the classic networks in the Internet

13   have been around for a long, long time.

14             In the file history, the inventor was

15   consistent.  In the file history of the '548 patent, he

16   said, quote, "In order to create or maintain a data network

17   which is organic," in other words, which grows, expands,

18   "i.e., adapts to demands and has a dynamic topology, it has

19   no managing or hierarchical structure."

20             If you adopt their position of the so-called

21   hybrid network with a server complement, then this is wrong,

22   and this is what they told the Patent Office, because what

23   they are contending for would have a network having control,

24   which they say doesn't happen.  It would be, the server

25   would be the managing part of it.  And here they clearly

1    tell the Patent Office that that is not what their invention

2    is.  And they did this to distinguish over a number of

3    references.  So this was not just a fluff statement.

4              So we know that the traditional hierarchical

5    network is out, and any kind of server network is out.

6              Now, there is something very interesting that

7    happened during the course of the later filed applications.

8              Ten years later, when the plaintiff decided that

9    he may want to assert these patents against some of the

10   modern music streaming companies like Spotify, in fact, the

11   complaint actually says that they think Spotify is the only

12   one practicing this, although I think they have changed

13   their view on that, but let's take a look at what they did.

14             So this is a supplemental preliminary amendment,

15   which means when they filed a continuation application, they

16   filed an amendment, usually just changing the claims,

17   because it's a continuation, you don't want the same claims

18   in the old one, so you start out with new claims and you

19   start out with a new prosecution.

20             This was filed, if we look at the last page of

21   it, February 17, 2011.  So it's ten years after the Dutch

22   application was filed.

23             If you turn to Page numbered 4, they started

24   amending the specification of the parent application.  They

25   started changing the specification.  This is the first

1   paragraph of the section of the description of the

2   invention.  And they changed it by striking out "the

3   invention" and putting in "the present disclosure."  What

4   they were trying to do was to eliminate the statements of

5   the inventor as to what his invention was, and call it a

6   disclosure so that they could make the argument that you

7   just heard, that these claims should not be limited to what

8   the inventor says the invention is.

9        The fact that they tried to eliminate this

10   language, I believe, is a compelling indication that they

11   were trying to change from "invention," which they knew they

12   would be bound to -- all the parent applications have this

13   language in it.  They knew that by saying it was the

14   invention that you would be bound to limit the claims to

15   what they say the invention is, which is the pure organic,

16   dynamic peer-to-peer network.  And they tried to eliminate

17   that because they knew they couldn't prove infringement

18   under that circumstance or at least they would have a better

19   chance if they could get rid of it.

20        I am not going to go through all of these.  If

21   you turn to the next page and the next page, you will see

22   that they did it nine times.  In nine instances they struck

23   out "the invention," "the disclosed invention," language of

24   that nature, and tried to change it to something more

25   squishy, like "the embodiment" or "an embodiment," in order

1      to avoid being held to what they said the invention was.

2               And then, if you turn to the last page, they

3      told the Patent Office, "By this supplemental preliminary

4      amendment, the specification has been amended to update the

5      reference to the patent applications for this continuation

6      application.

7               "No prohibited new matter has been added."

8               Well, first of all, what they did doesn't

9      comport with any of the parent applications that this is

10     based on.  They didn't tell the Patent Office that.  This is

11     a continuation, which means there has been no change.

12              As far as new matter, they eliminated exactly

13     what the patent applicant called his invention in the hope

14     of expanding the patent.  And we contend that that is new

15     matter.  This raises not only a clear example of why these

16     claims need to be held to what the inventor said his

17     invention was, but by doing this and now trying to assert

18     broader coverage, we believe it raises issues of inequitable

19     conduct and disclosure and a lot of other validity issues

20     that, of course, we will deal with at another time.

21              So they tried to scrub the language, basically

22     told the Patent Office they were just updating the

23     specification.  In fact, what they were doing was

24     eliminating exactly what they knew our argument would be,

25     that they had limited their patent by telling everybody what

1            the invention was.  And they crafted ambiguous language.

2                    You know, ambiguity is the friend of the

3    plaintiff in this case.  All we are trying to do is get some

4    clear definitions that will be helpful to the jury.

5                    So let's talk about the particular claim terms.

6    As I said, they fall into five categories:  the streaming

7    terms, the network terms, the node terms, the channel terms,

8    then there are a couple of others, device and autonomously.

9                    The streaming terms are found in all of the

10   patents.  And basically, we have four disputes:  whether the

11   data packages are transmitted; whether the transmission is

12   continuous.  By the way, the example of pausing that counsel

13   said, I am listening to a song and I push "pause," well,

14   when he pushed "pause" he stops streaming.  That's what

15   happens.  He stops streaming when he hits pause.

16                    Streaming means continuous play.  The patent

17   says so, and we will show you that.

18                    Whether the data packages are received by a

19   receiver in sequential order.  One of the applications of

20   this technology is radio.  If you don't receive the packets

21   in sequential order, you are going to get a conversation

22   that doesn't make any sense.  The patent says that and I

23   will show it to you.

24                    And whether the data packages are played by the

25   receiver while the transmission is occurring.

1           The point here is that it was well known to

2    download media stored on your computer -- that's what

3    Napster was all about, for example -- stored on your

4    computer and play it later.

5           The inventor says very clearly, that's not what

6    this invention is.  And I don't think Nonend is contending

7    that that is what their invention is, because they really

8    have validity problems if that is the case.

9           We have relied exclusively on the intrinsic

10   evidence, primarily from the specification but also from the

11   file history as well.

12          Let me talk for a minute about data packages.

13          This quote is what I was referring to a minute

14   ago.  Again, this comes from the description of the

15   invention.  "In case of a streaming audio or video

16   application, the sequential order of several data packages

17   is of importance because en route delaying during the

18   transmission of a data passage results in an irregular

19   broadcast."

20          So if I am listening to a song, I don't want

21   interruptions.  I don't want one part of the song playing

22   before another part.  I want it to play through

23   continuously, hopefully in time with the beat, if it is not

24   a rap song, but, anyway...

25

1              THE COURT:  I don't know, counsel.  These folks

2    are making a lot of money.

3              MR. BUNSOW:  I hear you.  They are very

4    flexible.

5              So, anyway, data packages clearly are part of

6    what we are talking about when we are talking about

7    streaming.  That is what is being sent.

8              The patent goes on in the description of the

9    invention, talking about content being divided into smaller

10   data packages that are subsequently transmitted.  I am kind

11   of surprised there is a dispute about this, because it is

12   pretty clear.

13             Let me move on to continuous.  And that means

14   that the streaming is a continuous operation.  If you are

15   watching a movie, and you are receiving part of it, you are

16   playing part of it, you want it to be a continuous

17   operation.  You have probably decoded over a slow Internet

18   connection where it actually was interpreted.  And you see

19   the little squiggly going around and around until it gets

20   more of the data.  And that is what this is all trying to

21   avoid, so that the broadcast doesn't falter.

22             An optimal data connection is of great

23   importance, of course.

24             The point about continuous is that streaming

25   makes no sense unless it's continuous.  If it wasn't

1    continuous, you wouldn't have to stream.  You could just

2    download and play it whenever you want to.

3              Sequential receipt of data packages, here again,

4    you want the data packages to appear in sequential order.

5    You can't have one part of the movie being played before

6    another part of the movie.  It has to come in a particular

7    order.  The patent describes that in describing the

8    invention.  And it clearly describes it in detail in the

9    embodiment.  They are described in -- you have the

10   references here.

11             Streaming requires the receiver to play the data

12   packages while the transmission is occurring.

13             The point here is that this is not downloading

14   of files to play later.  That is not what this invention is.

15   That had been done for decades before.  And the inventors

16   say that.

17             In distinguishing the Henzerling reference, the

18   inventor told the Patent Office, "Henzerling deals with the

19   traditional transmission and receipt of entire data files,

20   albeit between music players.  Once stored in memory 52, the

21   user may play the music file at his leisure."

22             That is the prior art.

23             "Thus, in Henzlinger's music players, only after

24   an entire file has been downloaded may it be made ready for

25   playback or transmission."

1          What they are saying here is, we do streaming,

2     that's called downloading.  Streaming means playing while

3     it's being received.

4          That is the distinction they are making.  That's

5     what their invention is.

6          And it says, further, in the '752 patent file

7     history, "At least a part of the media content retrieved as

8     a result of said first process is made ready for playback

9     and output to the first stream target."

10         The first stream target would be the speakers on

11    your stereo or your television screen.

12         So clearly, they are telling the Patent Office

13    what streaming is.  And streaming is playing it while you

14    are receiving it.  Pretty simple.

15         And they say it again at another part of the

16    '752 file history.  And they say it again.

17         So Nonend argues that it's permissive that it

18    may play back while it's being received but it doesn't have

19    to.  And the problem is, if it only may be played back, then

20    what they are covering is downloading and playing later.

21    It's as simple as that.  They are not streaming.  They are

22    downloading.

23         Clearly, to be honest with what the inventor

24    said his invention was and what's disclosed in the

25    specification and what he argued to the Patent Office,

1    streaming has to play while it's occurring, while the files

2    are being received.

3                    We rely on the specification.  We rely on the

4    file history.  Those are the best indicators of what the

5    claim should be.  And we propose that our definition should

6    be adopted because the permissive "may be played" is not

7    accurate and it snares the prior art, and it must be a

8    continuous transmission of data packages that are received

9    by a receiver in sequential order and played by the receiver

10   while the transmission is occurring.

11                   That's what the inventor over and over and over

12   again told the public and told the Patent Office.

13                   Now I will turn to the node terms.

14                   There is "peer node," "production node,"

15   "central node," "consumer node."

16                   We know what a peer node is.  A peer node, in

17   the most common example, is somebody's computer connected to

18   the Internet.

19                   Production node is a computer that provides some

20   content.

21                   A consumer node is something that is a computer

22   that receives content.

23                   The patent explicitly says that a production

24   node can be a production node at one time, a consumer node

25   at another time, and since these are all peers in the

1    organic, dynamic network, they can send and receive and

2    provide information to each other.  And we have seen

3    multiple examples of that.

4              These are terms in which the plaintiff says no

5    definition is required.  I beg to differ.  These are not

6    commonly understood terms, particularly by lay jurors.  And

7    we think definitions are appropriate.  And we think

8    definitions are necessary to maintain consistency with what

9    the inventor said his inventions were.

10             We propose that a peer node is a node in a

11   network that can act as a transmitter (server) of data

12   packages at one moment or as a receiver (client) of data

13   packages at another moment and change its role on its own

14   initiative.

15             That is not just a lot of words.  That is what

16   they said.  If you look at Column 2, in the description of

17   the invention, it says, "In conformity with the device

18   according to the invention it is namely possible that the

19   same peer at one moment acts as a server having a second

20   peer as a client and at another moment acts as a client of

21   the second peer now acting as a server, without a control

22   being at the basis thereof.  The two devices change role on

23   their own initiative."

24             That is the inventor's words, in the background

25   of the invention -- I am sorry, the description of the

1    invention section.  And we believe that that is clearly what

2    he was talking about.  And all of the embodiments show that.

3              So that should be the definition.

4              Nonend's proposal of plain and ordinary will

5    simply invite ambiguity and confusion.  That's true for

6    really all of the terms that they propose no definition for.

7    It would just allow sort of an unfettered run around the

8    courtroom on what these things mean, and I don't think

9    that's appropriate.

10             Production node, production node is a peer node

11   that transmits contents to other nodes when they request it.

12             The dispute here is that we rely on the patent

13   language.  We rely on the specification.  It transmits

14   contents to other nodes when they request it.  And it must

15   be a peer node.

16             So the dispute with all of these node terms is

17   that we say the node is a peer node.  They say it's just a

18   node.  By saying it's just a node, they would include a

19   server.  That is explicitly verboten in the specification,

20   in the file history, and the intrinsic record of this

21   patent.  All of these nodes have to be peer nodes.  That is

22   why we have added the word "peer," to avoid the argument

23   that these claims apply to non-peer nodes, like a server,

24   because the whole purpose of this invention and these

25   patents is to avoid the use of a server.

1                    THE COURT:  Mr. Bunsow, let me try some language

2       on both of you, a slight modification of your definition:  a

3       peer node that initially provides the content to the network

4       and transmits content to another node when requested.

5                    MR. BUNSOW:  That would be fine, Your Honor.

6                    THE COURT:  Counsel, you can react to that.

7                    MR. BUNSOW:  A production node must be a peer

8       node.  As I say, we have cited several examples here that

9       confirm that.

10                   So let's go on to central node.  Central node is

11      a curious one, because it's what clearly the claim says is

12      not what we are talking about here.  But it's consistent

13      with what the other nodes are and that the other nodes are

14      not a server controlling what's happening in the network.

15      That's the key point here.

16                   So a central node, which they say is not part of

17      the invention, is a node that controls other nodes in a

18      hierarchic system.

19                   They want to have a central node, call it a

20      server.  But that's exactly what this claim says it's not.

21      And that's what the patent says it's not.

22                   And in distinguishing the prior art, on Column 1

23      of the patent they explicitly said that.  They discuss the

24      5,511,168 patent.  And they say, each part, they are part of

25      a hierarchical system, each node is centrally controlled

1   here by means of a central node.

2           So this is the hierarchical hybrid type of

3   system that Nonend is trying to capture now when for years

4   and years and years they told the Patent Office that wasn't

5   what their invention was.

6           Consumer node, again, a consumer node is a peer

7   node that is provided with software to receive content and

8   to deliver it to other nodes requesting such, independent of

9   the source.

10          And that's similar to production node.  I think

11  our definition is about as crisp as you could craft.  But if

12  you have any other ideas on that, we would certainly be glad

13  to address it.

14          So consumer node is that.  It's just a peer node

15  that receives data and can transmit data.

16          So let me move on to the network terms.

17  "Peer-to-peer network" is in the '508 patent.  "Peer system"

18  is in the '513 patent.  "Network" is in the '315 patent.  "A

19  system for distributing media content" is in the '752.  And

20  "network of media players," finally, is in the '513 patent.

21          But all of these terms refer to a peer-to-peer

22  network.  That's clear from the specification.  It's clear

23  from the file history.

24          So our proposals are set forth on Slide 103.

25  Peer-to-peer network is a network of peer nodes.  Peer

1    system is a peer-to-peer network.  Network is a group of

2    interconnected peer nodes.  We saw that in Figure 6 of the

3    patent, as it's described.

4              A system for distributing media content is a

5    network of peer nodes used to transmit audio and video

6    content.  And a network of media players is a group of

7    interconnected peer nodes for connecting media players.

8    Media players here are just your computers.  That's all they

9    are.  Those are peer nodes.

10             Nonend proposes no definition for any of these

11   terms.  It would leave them to chance, basically, clearly

12   for the purposes of trying to massage this patent into

13   something that it was never intended to cover.

14             These are all connected to the peer-to-peer

15   system.  We have gone over that.  We believe that our

16   definitions are crisp, clear, and required by the patent and

17   the patent specification and the file history.

18             Moving on to the communication channel terms,

19   Your Honor, on 108.  There is the term "first communication

20   channel."  And our definition is a first communication via a

21   transmission medium to a first peer node.

22             The problem here is that Nonend would define

23   this term without saying where the transmission medium goes,

24   leaving it totally wide open.  And we think it's clear that

25   we are in a peer-to-peer system, so these connections have

1    to be between peers.  That's really the substance of the

2    dispute and all we are saying.  These claim terms have to be

3    interpreted in the environment in which they appear, and the

4    environment is a multi-node peer-to-peer system.  So they

5    have to be connected to peers.

6              THE COURT:  Other than that, there is really no

7    difference.

8              MR. BUNSOW:  That's correct, Your Honor.

9              "Device," this is a pretty easy one.  It's a

10   peer node.  If you look at the definitions that the inventor

11   used in Column 2, you will see that he uses "device" and

12   "peer node" interchangeably.  And we don't want an argument

13   that device is a server.  That's the problem.  Device is not

14   a server.

15             There is nothing in this patent that's a server.

16   And we are very concerned about a Nonend argument that an

17   inexact term like device means a server.  That's the

18   problem.

19             We have cited several examples to the patents

20   and the file history on Page 118 that shows that a device is

21   a peer node.

22             THE COURT:  Would you go back to that?

23             MR. BUNSOW:  Yes, sir.

24             THE COURT:  Okay.

25             MR. BUNSOW:  Autonomously, the word

```
 1    autonomously, again, Nonend proposes no definition so they
 2    can argue that it means pretty much anything.  Our
 3    definition, on its own initiative and independent of other
 4    nodes.  That is the crux of an organic, dynamic topology.
 5    All of these peers operate on their own.  They connect to
 6    each other.  They disconnect from each other.  There is no
 7    central control.  There is no server that controls what the
 8    network does.  That is the essence of what these patents are
 9    trying to describe and claim.
10              There is no server.  These are organic, dynamic
11    networks where the individual members operate autonomously.
12    They operate on their own.
13              That's why this definition is important.  A
14    patentee may impliedly redefine a term.  We know that case
15    law.
16              But the patent talks about autonomously in
17    several places, and says that it's independent of the
18    production node.  The node acts at its own initiative
19    entirely autonomously.  The device, according to the
20    invention -- this is Column 14.  "The device according to
21    the invention is autonomously capable of retrieving content
22    from a data network without the intervention of the
23    transmitting side."
24              It acts on its own.
25              That is the definition that we have proposed,
```

1    which, by the way, is consistent with multiple dictionaries

2    on Slide 125.  I know there is a lot of dispute over whether

3    dictionary definitions control or not --

4              THE COURT:  Well, given what the Fed Circuit

5    did, they clarified it for us.

6              MR. BUNSOW:  They went from Texas Digital to who

7    knows to back again.

8              I would commend these definitions to you because

9    they support our proposed definition.

10             So take-aways, the asserted patents concern only

11   peer-to-peer systems.  They disclaim non-peer-to-peer

12   systems.  They clearly disclaim any system with a server,

13   either central, hybrid, non-hybrid, whatever.  These are

14   equal peers in this system.

15             Nonend's failure to offer definitions is simply

16   an attempt to bring too much ambiguity into the case, and it

17   is not helpful to the Court, to the jury, or to us.

18             Unless you have any questions, that's my

19   presentation.

20             THE COURT:  Thank you for your presentation, Mr.

21   Bunsow.

22             Mr. McArthur, your reply.

23             MR. McARTHUR:  Thank you, Your Honor.  I will be

24   brief.

25             You heard counsel for Spotify talk about an

1    organic and dynamic technology a lot, terms that don't

2    appear anywhere in the claims.  They are not part of the

3    claim terms.  Let's talk about that for a minute.

4              They are describing part of the network that we

5    are talking about with hybrid.  It can be an organic and

6    dynamic technology in addition to having some hierarchical

7    components to it.

8              Now, they would have you read organic and

9    dynamic topology as only being peer-to-peer with nothing

10   else.  But the specification specifically points out that

11   the nodes can be in combination with the server.  I showed

12   you that earlier here.  So it is not only peer-to-peer.  It

13   can have --

14             THE COURT:  What page -- that is 21?

15             MR. McARTHUR:  Page 21, correct, Your Honor.

16   That is in all of the patent specifications.

17             Now, counsel urges the Court to read the

18   patents.  Read the specification for what it teaches.  I

19   submit to you if you read the specification, you will see

20   the word "peer" appear five times and five times only.  And

21   once you have implied that everything else means

22   peer-to-peer and not just organic topology, they would have

23   you ignore the embodiment that includes a server with nodes.

24             While you are reading that specification, Your

25   Honor, I submit you will not see the word primary embodiment

1    anywhere.  There are multiple embodiments that are set forth

2    in this specification, not just one, as counsel would

3    suggest.

4                It is a broad specification with many

5    embodiments.  Spotify focuses on one, and would have you

6    believe that is the only thing the claims are directed to.

7                Now, I am just looking at Page 53 of -- the

8    first is a procedural matter, Your Honor.  This never

9    appeared in their papers at all.  It sprung out here in the

10   hearing today.  I can address it on the fly.  We didn't have

11   a chance to brief it in our papers at all.

12               THE COURT:  Why don't you identify, when you say

13   "this," what you are talking about.

14               MR. McARTHUR:  This argument regarding the '548

15   file history, February 12, 2002 petition to make special.

16   It was not briefed in the papers by Spotify.  We didn't have

17   a chance to --

18               THE COURT:  This is Slide 53 of the defendants'

19   presentation.

20               MR. McARTHUR:  That's correct, Your Honor.  We

21   submit this is unfair surprise.  I will do my best to

22   address it.

23               This is the '548 patent, a patent that is not at

24   issue here today.  The claims aren't at issue.  The claim

25   terms are different.  What we are talking about here is

1    nodes that relate to specific claims that are not at issue

2    and not briefed before the Court, and they relate to growing

3    an organic network, part of the hybrid network I have been

4    talking about.

5            More specifically, they relate to the pulling of

6    content and not the pushing of content.  If we had an

7    opportunity to brief this, I would be able to explain that

8    more.  The crux of it is the specification talks about nodes

9    that request content, pull content from other nodes, pulling

10   it from a production node, pulling it from another consumer

11   node, and not being pushed content down from a server to

12   additional clients.

13           That's what this statement is saying here.

14           If you read this prosecution history in total --

15   I believe it's submitted into evidence, Your Honor -- you

16   can understand the distinction that is being made here.

17   This does not reach the claims that are at issue before the

18   Court.

19           Now, there is a lot of argument being made about

20   scrubbing the specification, and a lot of divining Spotify's

21   intent to scrub the specification and what that means ten

22   years down the line and today.

23           Three of the patents, or four of the patents, I

24   am not entirely sure which, contain the original language.

25   The analysis is exactly the same.  Does that exact language

1    evidence a clear disclaimer?  We suggest that it does not,

2    whether it says invention or disclosed embodiment.  The

3    analysis is the same.  It doesn't change the substance of

4    the specification.  Spotify admits that in their papers.

5    The specification substance does not change.  The language

6    is modified to more clearly point out the disclosed

7    embodiments, of which there are many in the patent.

8              What Spotify thinks is the intent is pure

9    conjecture.  The patentees clearly state what their

10   invention was.

11             I would urge you to look at the cases they cite

12   there, from the 1800s, and the Gentry Galley case they cite.

13   Those cases do not stand for the proposition of changing

14   invention to disclosed embodiment is disclaimer.  They

15   relate to new matter being injected into the

16   specification --

17             THE COURT:  I know disclaimer when I see it.

18             MR. McARTHUR:  I will move on.

19             Quickly touching on the streaming.  "May be

20   capable."  "May be played" is capable being played.  In the

21   downloading prior art it was not capable of being played.  I

22   submit to you and I represent the streaming claims of our

23   patents do not reach downloading of the prior art.

24             Your Honor asked a question about whether

25   production node would be a peer node at the initial entry of

1      content.  We respectfully disagree.  Production node is not

2      a peer node.  It is a node.  The production node -- nodes

3      are nodes.  Peer nodes are specific types of nodes.  It's

4      all over the specification.  "Peer" appears five times.

5      "Node" appears, I am not sure, but multiples of that, to use

6      the patentee's word to describe what they had.

7                    Counsel argued that a lot of the constructions

8      that they offer and that we don't offer construction for

9      would help the jury and that's the standard.  That's not the

10     standard, Your Honor.  The standard is what one of ordinary

11     skill in the art would understand the term to be.  If that

12     has a plain and ordinary meaning to one of ordinary skill in

13     the art, that should be the construction, plain and ordinary

14     meaning.

15                    I am sure defendants and the plaintiffs will

16     have experts up here to explain what that means to the jury.

17                    THE COURT:  What happens if the experts don't

18     agree on the plain and ordinary meaning and I need to give

19     guidance to the jury?  What happens in that instance?

20                    MR. McARTHUR:  I believe Your Honor would

21     understand that you can explain to the jury that they are

22     free to believe one or the other, and their credibility.

23                    THE COURT:  The best definition that you are

24     offering.  Haven't I abdicated my responsibilities under

25     Markman to define the term that is in dispute?

```
1              I know there is a little bit of tension there in
2    a couple Federal Circuit precedents on this subject.
3              MR. McARTHUR:  I certainly agree with you, Your
4    Honor.  There is a tension between your duties as a definer
5    of the terms and the construction that if it has plain and
6    ordinary meaning to one of ordinary skill in the art you
7    shouldn't define the term.  I think it's sort of
8    outcome-dependent in a lot of cases I have read.  The
9    Federal Circuit says, it may have a plain and ordinary
10   meaning, but we kind of like this definition more so let's
11   give this to the jury.  Sometimes they believe it is clear
12   enough --
13             THE COURT:  When you go down to Washington,
14   don't tell them they are issuing results-oriented opinions.
15   They won't appreciate that.
16             MR. McARTHUR:  That is my humble opinion.
17             THE COURT:  I understand.  That's fair argument.
18             MR. McARTHUR:  With respect to central node,
19   here it is, Claim 38, the independent claim, it says, "where
20   no other media player is a central node."
21             This is a dependent claim.  This dependent claim
22   modifies Claim 33.  It talks about media players.
23             Here, the doctrine of claim differentiation
24   would suggest that Claim 33, it is possible to have a media
25   player that has some central controller, which suggests some
```

1    elements of hierarchy are possible within the claims.  The

2    specification also mentions that with respect to server and

3    nodes being included.

4              With that, Your Honor, I will sit down.

5              THE COURT:  Thank you.

6              I am going to ask Mr. Bunsow to address two

7    things, and I think he wants to address a third.  And I will

8    give you the last word, probably what you just said.

9              Mr. Bunsow, could you talk about plaintiff's

10   Slide 51, the specification, where he cites to the language

11   which is underscored in his presentation describing "without

12   expansion of the capacity of the server."

13             I think that's the key phrase, the server, where

14   you indicate, this is not a hierarchical system where there

15   is a server, as all of us have come to know that.  And your

16   Slide 53, the one where counsel says this is new to him, was

17   new.

18             MR. BUNSOW:  Right.  So our Slide 53 is from the

19   '548 file history.  The '548 is actually cited in our brief,

20   not this quote.  But we talk about the '548 as being one of

21   the prior patents.  And, of course, all of the patents have

22   to be consistent in their lineage.

23             This particular quote is very consistent with

24   about four or five other quotes that we have that are before

25   it and after it.  It's more of a make weight quote.  This is

1      not something new.  This is not a new position.

2                  THE COURT:  Of course, you heard counsel say

3      this is a new argument that wasn't briefed.

4                  MR. BUNSOW:  Fair enough.  We relied on a piece

5      of the '548 file history that confirms what we had said

6      before, which is Column 2 of the patent, for example, says

7      the same thing, "without hierarchy," in contrast to the

8      classic networks and the Internet.

9                  THE COURT:  In point of fact, your contention is

10     it is not a new argument.  It is a new, perhaps, piece of

11     corroborating information.

12                 MR. BUNSOW:  It is No. 5 of 6 that we threw in

13     this morning.

14                 THE COURT:  I got you.

15                 What about 21 of Mr. McArthur's slide

16     presentation?

17                 MR. BUNSOW:  Yes.  What they are doing here is

18     contrasting the typical server network, which has

19     limitations.  So the server that is in this building has a

20     certain limitation to it.  And what they are saying is by

21     doing this group of nodes which grows organically and

22     dynamically, we can increase basically what the server would

23     be able to serve.  That's all it's saying.  That's all it

24     is.

25                 By the way, you will not find an embodiment in

```
 1     this patent or any of the other patents in this case that

 2     shows a server hierarchic configuration.  You won't find it.

 3     What they are arguing for is not shown anywhere.

 4                THE COURT:  Thank you, Mr. Bunsow.

 5                MR. BUNSOW:  Thank you.

 6                THE COURT:  Anything further on those points,

 7     Mr. McArthur?

 8                MR. McARTHUR:  Just quickly, Your Honor.

 9                To be clear, I wasn't arguing that they didn't

10     make the non-hierarchic argument.  What I was pointing

11     out --

12                THE COURT:  It wasn't clear when you said that.

13     Now it's clear.

14                MR. McARTHUR:  I was pointing out they didn't

15     raise this particular prosecution history excerpt from a

16     patent that is not at issue and claims that are not at

17     issue.  And it is an ongoing negotiation between the

18     patentee and the Patent Office.

19                THE COURT:  I understand.

20                MR. McARTHUR:  This is an embodiment, Your

21     Honor, that shows servers with nodes.  It's the larger the

22     network becomes, the more nodes are added, server expansion

23     is not required.

24                THE COURT:  This helps highlight.  There is just

25     a fundamental disagreement between the parties.
```

1              MR. McARTHUR:  Also, Figure 2A, Your Honor, we

2    showed that at the beginning of our presentation, showing

3    the production node.  Production node.  Consumer nodes.  The

4    production node can in this case have the elements of

5    hierarchy to it.

6              THE COURT:  Why don't you point those out.

7              MR. McARTHUR:  The production node, to the

8    consumer nodes, to other nodes.

9              THE COURT:  I see what you are saying.

10             MR. McARTHUR:  Then we get to the last one.

11             THE COURT:  Mr. Bunsow, what do you want to say?

12             MR. BUNSOW:  Production nodes and consumer nodes

13   are all peer nodes, Your Honor.  They are all the same.

14             THE COURT:  I could have articulated it, perhaps

15   not as well.  I do understand the point.  And I do really

16   see -- it's nice to have a clear difference, because it's

17   not always the case when we are trying to engage, my law

18   clerk and I, in this exercise of trying to construe these

19   disputed terms.  That is helpful.

20             MR. BUNSOW:  We appreciate your time this

21   morning.

22             THE COURT:  Thank you for your time.

23             I will endeavor, more or less, to get an order

24   out in 30 days.  You know that's my practice.

25             (Matter conducted off the record.)

1                    **(Matter concluded at 12:15 p.m.)**

2                                    **-   -   -**

3        **Reporter:   Kevin Maurer**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25